*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2016 UT 20**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

USA POWER, LLC, USA POWER PARTNERS, LLC, and
SPRING CANYON ENERGY, LLC,
*Appellees and Cross-Appellants,*

*v.*

PACIFICORP,
*Appellant and Cross-Appellee.*

USA POWER, LLC, USA POWER PARTNERS, LLC, and
SPRING CANYON ENERGY, LLC,
*Appellants,*

*v.*

JODY L. WILLIAMS and
HOLME ROBERTS & OWEN, LLP,
*Appellees.*

No. 20130442

Filed May 16, 2016

On Direct Appeal

Third District, Salt Lake
The Honorable Anthony B. Quinn
No. 050903412

Attorneys:

Peggy A. Tomsic, James E. Magleby, Eric K. Schnibbe, Salt Lake City,
for USA Power, LLC, USA Power Partners, LLC, and
Spring Canyon Energy, LLC

Peter Watson Billings Jr., James S. Jardine, Michael G. Jenkins,
P. Bruce Badger, Samuel C. Straight, Timothy K. Clark,
Salt Lake City, for PacifiCorp

Michael D. Zimmerman, Thomas R. Karrenberg, Stephen P. Horvat,
Troy L. Booher, Clemens A. Landau, Salt Lake City, for
Jody L. Williams and Holme Roberts & Owen, LLP

---

Chief Justice Durrant authored the opinion of the Court, in which Associate Chief Justice Lee, Justice Durham, and Judge Toomey joined.

Having recused himself, Justice Himonas does not participate herein; Court of Appeals Judge Kate A. Toomey sat.

Justice John A. Pearce became a member of the Court on December 17, 2015, after oral argument in this matter, and accordingly did not participate.

---

Chief Justice Durrant, opinion of the Court:

**Introduction**

¶ 1     This case concerns a dispute about proprietary plans to develop a power plant. USA Power, LLC engaged in extensive work to research and develop a power plant project in Mona, Utah—its Spring Canyon "vision." It claims that this vision is a trade secret, that PacifiCorp misappropriated it, and that PacifiCorp also breached a confidentiality agreement between the parties. USA Power further claims that its water attorney, Jody L. Williams, and her law firm, Holme Roberts & Owen, LLC (HRO), (collectively, Ms. Williams) breached their fiduciary duties by working for PacifiCorp to acquire water rights on a competing power plant proposal.

¶ 2     USA Power's Spring Canyon vision took two years, thousands of work-hours, and close to $1 million to develop. To advance its proposed power plant project, it made several public disclosures to regulatory bodies. These disclosures included such information as the plant's proposed location, technological specifications, fuel type, water use, and generating capacity. Other information about the proposed plant, such as USA Power's economic and feasibility studies, was not publicly disclosed.

¶ 3     Meanwhile, PacifiCorp had identified a quickly approaching need for energy and was working to meet this demand. As part of its response to its upcoming power needs, PacifiCorp approached USA Power and entered into negotiations to purchase USA Power's Spring Canyon assets. As part of these negotiations, USA Power required PacifiCorp to sign a Confidentiality and Non-Disclosure Agreement before it would divulge its entire Spring Canyon vision, i.e., a compilation of both the already disclosed information and the portions of its vision that had not yet been publicly disclosed. PacifiCorp did so, and USA Power provided

PacifiCorp details on its entire project, including the non-public backup studies that validated its public disclosures.

¶ 4    Eventually PacifiCorp terminated the negotiations over the sale and decided to issue a Request for Proposal (RFP) to obtain bids for power sufficient to cover its needs. USA Power submitted its Spring Canyon project in response to PacifiCorp's RFP. PacifiCorp submitted its own competing proposal, however, to build a power plant in Mona—its Currant Creek project. PacifiCorp's project was very similar to the Spring Canyon project proposed by USA Power. PacifiCorp also retained Ms. Williams, USA Power's former attorney, to help it obtain water rights for its Currant Creek project. PacifiCorp selected its own bid over USA Power's bid and, soon after, began construction on its project.

¶ 5    USA Power then brought suit against Ms. Williams asserting malpractice claims based on an alleged breach of her fiduciary duties of confidentiality and loyalty. USA Power later amended its complaint to include PacifiCorp as a defendant, asserting that PacifiCorp had misappropriated USA Power's trade secrets—its "vision" for a plant in Mona, Utah and various components of this vision, which were themselves trade secrets. This case first came to the court in 2010, after the trial court granted summary judgment to both Defendants.[1]

¶ 6    In *USA Power I*, we reversed the grant of summary judgment, holding that issues of material fact existed and summary judgment was inappropriate.[2] We also clarified that a compilation of publicly available information could, in some circumstances, constitute a trade secret. After *USA Power I*, a five-week jury trial was held. Both parties moved for a directed verdict on all of USA Power's claims. The court denied these motions except as to USA Power's claim against Ms. Williams for punitive damages. The jury returned a special verdict against PacifiCorp and Ms. Williams, both of whom filed a rule 50 judgment notwithstanding the verdict (JNOV) motion and a rule 59 motion for new trial. The trial court denied PacifiCorp's motions, except to reduce the unjust enrichment award against PacifiCorp, granted Ms. Williams's JNOV motion for lack of evidence related to causation, and determined that USA

---

[1] *USA Power, LLC v. PacifiCorp*, 2010 UT 31, 235 P.3d 749 [hereinafter *USA Power I*].

[2] *Id.* ¶¶ 59, 71.

Power was entitled to attorney fees. The court also denied USA Power's request for exemplary damages and prejudgment interest. The parties appealed all adverse rulings.

¶ 7    We uphold the trial court on all claims. First, we uphold the trial court's denial of PacifiCorp's JNOV on the trade secret issue. As discussed below, under our deferential standard of review, there was a sufficient basis in the evidence from which the jury could reasonably conclude that certain components of USA Power's vision were not generally known or readily ascertainable. It is important to note that PacifiCorp appealed only the issue of whether a trade secret existed, conceding for purposes of appeal that if there was a trade secret, it was misappropriated. Second, as to USA Power's cross-appeal challenging various aspects of the damages award, we affirm the trial court's rulings, holding that the trial court applied the correct standards and did not abuse its discretion. Finally, regarding USA Power's direct appeal of the JNOV granted in favor of Ms. Williams, we affirm the trial court because there is no competent evidence demonstrating that Ms. Williams caused USA Power's damages or that USA Power would have benefitted if Ms. Williams had not breached her fiduciary duties. Accordingly, we affirm the trial court's ruling as to each issue presented on appeal.

## Background

¶ 8    This dispute focuses on USA Power's preliminary design of a power plant in Mona, Utah—its Spring Canyon vision—and PacifiCorp's alleged use of that plan to build its own power plant project.[3] The preliminary design phase for a power plant involves site specific economic and technological feasibility studies. These studies are necessary for the financing and permitting of the plant. Preliminary design generally costs one to two percent of the plant's total cost and takes between eighteen and twenty-four months if the company starts from scratch.

¶ 9    USA Power claims that PacifiCorp misappropriated its trade secrets, which consisted of its Spring Canyon vision generally as well as the following:

---

[3] "'On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly.' We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (citations omitted).

> (1) technical information about the size, location, configuration, economics, engineering, and assets of [the Spring Canyon project]; (2) business strategies, goals, and plans including *proformas* describing cost and profitability; and (3) [USA Power's] first-to-market advantage—i.e., the ability to obtain financing and get to the market first and <u>block potential competitors</u>.

USA Power claims it disclosed these trade secrets to PacifiCorp mainly through three volumes of confidential information it provided PacifiCorp pursuant to the Confidentiality and Non-Disclosure Agreement, though it also disclosed some information related to its vision in emails and other communications between the parties. USA Power expended significant resources conducting preliminary design work for Spring Canyon, including two years, thousands of work-hours, and close to $1 million.

¶ 10 USA Power publicly disclosed various pieces of information about its Spring Canyon proposal on three occasions. First, in February 2002, it filed a Notice of Intent (NOI) with the Utah Department of Air Quality (UDAQ). This document was public and included a description of "the fuels and their use," the "equipment used in process," "operation schedules," "production rates," and "raw materials used." The project description also stated that "the use of dry type air-cooled condenser will . . . greatly reduce the plant's water usage" and that the plant was "projected to begin operation in September 2003." From this public disclosure, it was clear that the Spring Canyon plant would be an air-cooled combined-cycle natural gas plant with two GE 7-FA turbines, two heat recovery steam generators, one steam turbine, air inlet chillers, duct firing, and specific emissions controls, and would be located in Mona, Utah.

¶ 11 The second public disclosure occurred in May 2002, when USA Power filed an "Application for Zone Change Permit" with Juab County. The rezoning application was a public document and described the Spring Canyon plant as a "base-load natural gas-fired combined cycle power generation facility." It also described the plant's capacity, technology,[4] and specific location, including a map

---

[4] The zoning change permit described the plant capacity as 530 MW and its technology as including two General Electric Frame 7-FA gas turbines with air inlet chillers, "two heat recovery steam generators to create additional 'combined cycle' power," an air-

(Continued)

and site plan. The final disclosure took place after notice from the State that USA Power lacked the emission credits for a two gas turbine configuration. USA Power subsequently resubmitted a NOI for a 1x1 configuration. This application was for the same plant configuration as that filed in February 2002, except for the elimination of one gas turbine.

¶ 12   Although various details about the configuration and location of the plant were publicly disclosed, other information about USA Power's preliminary design of Spring Canyon remained private. This information included the economic and technical analysis that supported USA Power's publicly disclosed choices— the design and location selected for its plant. The parties refer to this information as the "back-up studies." And this non-public information included:

> "order of magnitude" cost estimates, the cost of dry cooling versus wet cooling (including the 3% "energy penalty"), water usage, turbine performance analysis (i.e., heat rates), [USA Power's] land and water options pricing, the approximate route for a lateral from Questar's pipeline, business plans, and economic proformas for a power purchase agreement ("PPA") with PacifiCorp.

Ultimately, USA Power invested significant time and resources in developing its Spring Canyon vision and going through the permitting process, which enabled it to present a fully developed proposal to PacifiCorp. USA Power argues that its entire vision for the Spring Canyon plant—including its publicly disclosed configuration and its private rationale for that configuration— constituted a trade secret. USA Power further claims that the individual pieces of non-disclosed information also constitute trade secrets.

¶ 13   The first meeting between USA Power and PacifiCorp took place in August 2002. At this meeting, USA Power would not discuss any confidential information about its Spring Canyon proposal without a signed confidentiality agreement. The parties signed a Confidentiality and Non-Disclosure Agreement on September 11, 2002. After signing the Agreement, USA Power gave PacifiCorp two volumes of confidential information regarding its Spring Canyon

---

cooled condenser, and the "Lowest Achievable Emission Rate technology," utilizing "Selective Catalytic Reduction."

project (Volumes I and II). PacifiCorp expressed various concerns about the Spring Canyon project, including the viability of dry cooling, but "indicated that [Spring Canyon] was the only project in line to meet the 2005 [energy] demand." Further, Rand Thurgood, PacifiCorp's Managing Director of Resource Development, indicated that if PacifiCorp "were to try to do this it would take them two to three years . . . [and] millions of dollars to accomplish." USA Power continued to provide information to address PacifiCorp's concerns, including the calculation of the energy penalty for the dry cooling process.

¶ 14    The discussions between PacifiCorp and USA Power occurred in the broader setting of an impending energy shortage. As early as 2001, PacifiCorp knew that it would need additional "peaking" capacity to meet demand in the summer of 2005. PacifiCorp analyzed various strategies to address this shortage in its 2003 Integrated Resource Plan. These strategies were summarized in a January 9, 2003 memorandum to the Chief Executive Committee, which identified three options: (1) purchasing power through contract purchases, (2) acquiring existing plants, or (3) building new facilities.

¶ 15    The memorandum also discussed the difficulties with each option, stating that power purchases "must come from outside the Utah bubble" and "[t]he already full transmission paths into the bubble will limit if not prohibit purchases sufficient to meet the additional requirements." It also noted the tight timeframe for building new facilities, stating that "physical project schedules (design, engineering, permitting and construction) are extremely tight even if the project approvals were given today." And in considering building options, it noted that "[t]he only project that has any possibility of meeting heavy load hour peaking for 2005 or even a 2006 commercial date is the Spring Canyon project."

¶ 16    A second February 5, 2003 memorandum to the Chief Executive Committee written by Rand Thurgood, Managing Director of Resource Development, and Mark Tallman, Director of Origination, further refined PacifiCorp's options and requested approval for several actions. In this memorandum, PacifiCorp sought internal authority to take several actions that would allow it to compile its own build proposal. For instance, it sought approval to purchase the Mona assets of both USA Power and another Mona power plant project being developed by Panda Energy. Specifically, the memorandum sought approval to (1) "purchase the Panda position in Mona for $1,006,989.81 and extend the associated land options," (2) "negotiate and purchase USA Power's rights associated

with their Mona site," (3) "spend up to $500,000 (during FY 2004) for engineering design" for either the USA Power site and/or the Panda site pending their acquisition, and (4) "issue an asset-based RFP in March or April 2003 to meet the April 2005 IRP peaking need for the Utah Bubble."

¶ 17   The February 5, 2003 memorandum noted that CH2M HILL, a consulting firm hired by PacifiCorp, had conducted a "siting study for gas-fired generation along the Wasatch Front" and the study "strongly indicate[d] that the Mona area [was] one of the best areas (if not the best area) for the development of gas-fired generation to meet peaking and/or base load generation needs." The memorandum also noted that purchasing power from a Nevada source was possible but expensive, costing more than $7.9 million for a two-year supply of power. Finally, it described the "optimal outcome" as the acquisition of both Panda's and USA Power's Mona assets. This would give PacifiCorp "the most flexible and cost effective build alternative" and allow it to "combine the projects and immediately begin engineering to secure a viable combined cycle build option for meeting the April 2005 target date for a peaking resource."

¶ 18   PacifiCorp moved forward with negotiations to purchase USA Power's and Panda's Mona assets in order to prepare its own proposal to build a power plant project and then submit this proposal to its RFP. In February 2003, USA Power provided PacifiCorp additional confidential information on the viability of its Spring Canyon project contained in Volume III, which included economic proforma assumptions and projections. In March 2003, PacifiCorp agreed to purchase the Spring Canyon project for $3 million and also to enter into a "non-binding joint development agreement for other projects" for $2.29 million. But this agreement was never reduced to writing and eventually fell apart. PacifiCorp later informed USA Power that it would not purchase the Spring Canyon project, but encouraged it to bid in the upcoming RFP, stating that "[i]t was [USA Power's] RFP to lose because [it] had done so much work on the project that nobody stood a chance to beat [it]."

¶ 19   During this time frame, PacifiCorp retained Ms. Williams, a water law attorney based in Salt Lake City. Ms. Williams had worked for USA Power off and on since April 2001, helping it evaluate the feasibility of the Mona site and acquire options on the water rights needed for Spring Canyon. "By August 2002, [USA Power] had acquired options on sufficient water [through Ms. Williams's work] and was negotiating with PacifiCorp for sale of

its power plant project." USA Power claims that Ms. Williams's work for PacifiCorp caused the March 2003 purchase agreement to fall through, pointing mainly to the sequence of events in support of its causation theory. On March 3, 2003, PacifiCorp retained Ms. Williams to assist it in obtaining water rights. On March 14, PacifiCorp entered into an agreement with USA Power to purchase Spring Canyon. On March 17, PacifiCorp backed out of that agreement and decided to develop its RFP bid without purchasing USA Power's assets. While negotiations were ongoing, Ms. Williams worked to acquire water rights from Geneva Steel for PacifiCorp, which efforts were ultimately unnecessary as PacifiCorp obtained water from another source.

¶ 20  During the same time period, PacifiCorp was also negotiating with Panda to acquire its Mona assets and contacting engineering firms. In February 2003, PacifiCorp purchased Panda's Mona assets for $969,003. These assets included valuable meteorological data, land-purchase options, and transmission interconnect studies. PacifiCorp also made initial contact with engineering firms, soliciting information on their experience with "combined cycle power plants, utilizing 1x1 and 2x1 configuration, GE 7FA gas turbines with inlet chillers, duct burners, [and] wet and dry cooling."

¶ 21  PacifiCorp then focused on producing its own bid for the upcoming RFP. It met with Questar to discuss the siting of a lateral gas pipeline to the Mona site and sought internal approval to spend $16.2 million for up to 6,000 acre-feet of water that would be needed for a 1000MW water-cooled, combined-cycle plant in Mona. By mid-May, "Questar [had] agreed to obtain right-of-way for, construct, and own the gas lateral for PacifiCorp's Mona site at PacifiCorp's expense."

¶ 22  PacifiCorp also hired an engineering firm, Shaw/Stone & Webster (SS&W), to provide engineering services for a possible Mona plant, capping SS&W's fees at $250,000. Instead of starting from scratch, PacifiCorp asked SS&W to focus on "combined cycle power plants, utilizing 1x1 and 2x1 configuration, GE 7FA gas turbines with inlet chillers, duct burners, [and] wet and dry cooling" located in Mona. After approximately seven weeks of work, SS&W delivered its initial report to PacifiCorp in June 2003. This report included "detailed cost estimates, analysis of wet versus dry cooling, including the energy penalty, water balances, and heat balances." In its work for PacifiCorp, SS&W did not use any non-public information from USA Power and used a similarly designed power plant, Apex, as a reference for its work.

¶ 23   Also in June 2003, PacifiCorp issued its RFP to meet the identified need for power in 2005, with a deadline for bid submittals on July 22, 2003. In response, PacifiCorp received one hundred bids from thirty-seven companies, which "includ[ed] bids of different configurations for Mona, and various bids of configurations similar to" Spring Canyon. USA Power submitted four bids to supply power under a Power Purchase Agreement (PPA) from its Spring Canyon project. PacifiCorp submitted its own proposal on July 17, 2003. After reviewing the submissions, and receiving an evaluation by a neutral third party, PacifiCorp awarded itself the bid on September 22, 2003, deciding to build its own plant in Mona—Currant Creek.

¶ 24   After awarding itself the bid, PacifiCorp moved forward with permitting and detailed design for its Currant Creek plant. As part of this process, PacifiCorp needed to secure the water rights necessary for its project. Through Ms. Williams, it obtained water rights from WW Ranches by signing a water purchase agreement on September 3, 2003—after it had submitted its bid in the RFP process but prior to actually awarding itself the bid—conditioned on approval from the State Engineer and the Goshen Water Board. In order to obtain this approval, on November 3, 2003, PacifiCorp applied for a change application to divert the needed water to its project. Construction began on the Currant Creek plant in January 2004. The necessary water rights approvals were obtained in February 2004. PacifiCorp used a phased approach to construction—first phasing in single-cycle power production in the summer of 2005 and later phasing in combined-cycle facilities. PacifiCorp spent $341.2 million on construction of Currant Creek and used Panda's assets, including critical meteorological data, to expedite development of the plant by eighteen months.

¶ 25   USA Power filed its complaint on February 18, 2005, which, as amended, alleged in part that PacifiCorp breached the Confidentiality and Non-Disclosure Agreement and violated the Utah Uniform Trade Secrets Act (UUTSA). USA Power also brought a breach of fiduciary duty claim against its water attorney, Ms. Williams, and her law firm, HRO. The trial court granted summary judgment in favor of the Defendants on all of USA Power's claims, which we reversed in *USA Power I* in 2010, holding that, when appropriate legal standards were applied, issues of material fact precluded summary judgment. We remanded for further proceedings.

¶ 26   In May 2012, after a five-week trial, a jury found that PacifiCorp had willfully and maliciously misappropriated a trade secret from USA Power and breached the Confidentiality and Non-

Disclosure Agreement. The jury awarded USA Power more than $133 million in damages—composed of actual losses ($21,399,391) and unjust enrichment damages ($112,500,000) caused by PacifiCorp's misappropriation. The jury also found that Ms. Williams and her law firm had breached their fiduciary duty to USA Power because Ms. Williams had worked for both USA Power and PacifiCorp to secure water rights. The jury found that this breach had also caused USA Power's actual damages, the $21,399,391, and allocated $18,189,489.35 of those damages to PacifiCorp (85%) and $3,209,908.65 to Ms. Williams and her law firm (15%). The trial court later reduced the unjust enrichment award to $91,110,609, finding that the damages for actual loss and for unjust enrichment were duplicative. The court also awarded attorney fees and costs for USA Power's claims against PacifiCorp based on a stipulation of the parties as to the amount ($2,322,468.11), making the total final judgment $114,822,468.11.

¶ 27    PacifiCorp moved for JNOV, arguing that USA Power did not prove the existence of a trade secret as a matter of law. The trial court denied PacifiCorp's JNOV motion, and PacifiCorp appealed. PacifiCorp did not appeal the jury's finding of misappropriation.[5] Ms. Williams also filed for a JNOV, arguing that USA Power had failed to prove that any breach of fiduciary duty caused the claimed damages. The trial court granted Ms. Williams's JNOV motion, finding that the causation element of the breach of fiduciary duty claim was lacking as a matter of law. USA Power appealed the grant of the JNOV in favor of Ms. Williams. PacifiCorp's appeal of the JNOV denial and USA Power's appeal of the grant of JNOV to Ms. Williams were consolidated. Further, USA Power cross-appeals on PacifiCorp's appeal, arguing that its damage award was inadequate in several ways. We have jurisdiction over these appeals pursuant to Utah Code section 78A-3-102(3)(j).

## Standard of Review

¶ 28    We address the applicable standards of review beginning with those relevant to PacifiCorp's direct appeal, then those relevant to USA Power's cross-appeal, and finally those relevant to USA Power's direct appeal.

---

[5] In its brief PacifiCorp states that it did not appeal the misappropriation finding "because of space constraints" but does not concede this issue. But since PacifiCorp chose not to appeal this issue, we consider it conceded for the purposes of this appeal.

### PacifiCorp's Appeal

¶ 29   PacifiCorp raises four issues in its direct appeal. First, it argues that the trial court incorrectly denied its motion for JNOV because USA Power "did not define its trade secret with sufficient specificity." Second, it argues that it was entitled to a JNOV because USA Power "failed to present sufficient evidence that its alleged compilation trade secret was not generally known and not readily ascertainable." Both of these arguments challenge the trial court's decision to deny a JNOV. While we review a trial court's ruling "on JNOV motions for correctness," we will overturn its decision to deny a JNOV only if the appellant can demonstrate that there was no basis in the evidence, including reasonable inferences which could be drawn therefrom, to support the jury's verdict.[6]

¶ 30   Third, PacifiCorp argues that it is entitled to a new trial or remittitur because the trial court inappropriately awarded unjust enrichment damages that included "all of [its] profits from its Currant Creek plant over thirty years." "We apply an abuse of discretion standard in reviewing a trial judge's decision to grant or deny a new trial or remittitur . . . ."[7] Finally, PacifiCorp argues it was entitled to a jury instruction detailing the head-start limitation on unjust enrichment. "We review a district court's refusal to give a jury instruction for abuse of discretion."[8]

### USA Power's Cross-Appeal

¶ 31   USA Power raises five issues on its cross-appeal. First, it argues that the court erred by granting a remittitur and reducing its trade secret damages against PacifiCorp. When reviewing a rule 59(a)(6) motion, "the trial judge is in the best position to ascertain if the jury has 'exceeded its proper bounds,' and we will reverse 'only if there is no reasonable basis for the decision.'"[9] Thus, we review for abuse of discretion.[10] Second, USA Power argues that the trial court

---

[6] *ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 2013 UT 24, ¶¶ 18–19, 309 P.3d 201.

[7] *Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 25, 82 P.3d 1064.

[8] *Miller v. Utah Dep't of Transp.*, 2012 UT 54, ¶ 13, 285 P.3d 1208.

[9] *Diversified Holdings, L.C. v. Turner*, 2002 UT 129, ¶ 4, 63 P.3d 686 (citation omitted).

[10] *See Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 8004 (Utah 1991) (stating that "[u]nder our rule 59, it is well settled that, as a general matter, the trial court has broad discretion to grant or deny a motion

(Continued)

erred by denying exemplary damages under the UUTSA. We review the standard applied by the trial court in determining whether to grant exemplary damages for correctness,[11] but, so long as the correct standard is used, "the decision to grant or deny enhanced damages remains firmly within the scope of the district court's reasoned discretion."[12] Third, USA Power argues that the trial court erred in the standard used to determine attorney fees, which we review for correctness.[13]

¶ 32    Fourth, USA Power argues that it was entitled to prejudgment interest from the time USA Power's loss was established or, alternatively, from the time of the verdict up until the time of the entry of judgment. Finally, USA Power argues that the ten percent interest rate in Utah Code section 15-1-1 is the appropriate interest rate for any prejudgment interest as well as post-judgment interest. Each of these issues is a question of law that we review for correctness.[14]

### USA Power's Direct Appeal

¶ 33    The final appeal focuses on whether Ms. Williams, by breach of her fiduciary duties,[15] caused USA Power's losses. USA Power raises three issues in its direct appeal. First, it argues that the trial court erred in granting Ms. Williams's motion for judgment notwithstanding the verdict "on the grounds there was no evidence for the [j]ury to find the element of causation" as it related to USA Power's failed bid. Second, USA Power argues that the court also

---

for a new trial" before discussing "[t]he precise nature of that discretion and what constitutes an abuse").

[11] *See Schroeder v. Utah Attorney Gen.'s Office*, 2015 UT 77, ¶ 17, 358 P.3d 1075.

[12] *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1274 (Fed. Cir. 1999).

[13] *See Campbell v. State Farm Mut. Auto. Ins. Co.*, 2001 UT 89, ¶ 13, 65 P.3d 1134, *rev'd on other grounds*, 538 U.S. 408 (2003); *Schroeder*, 2015 UT 77, ¶ 17.

[14] *See Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 11, 210 P.3d 263.

[15] The trial court granted JNOV in favor of Ms. Williams only on the element of causation. Accordingly, we assume for purposes of this appeal that Ms. Williams did breach her fiduciary duties.

erred in granting Ms. Williams's motion for lack of evidence of causation as it related to the lost contract between USA Power and PacifiCorp to purchase USA Power's project. Both of these issues challenge the trial court's grant of JNOV, though they differ as to the damages alleged to have been caused by Ms. Williams. Finally USA Power contends that the trial court erred in granting Ms. Williams's motion for a directed verdict on USA Power's punitive damages claim.

¶ 34    The standard of review for these claims is the same[16]: "We review a trial court decision on . . . a motion for j.n.o.v. for correctness."[17] "A directed verdict and a judgment n.o.v. are justified only if, after looking at the evidence and all reasonable inferences in a light most favorable to the nonmoving party, 'the trial court concludes that there is no competent evidence which would support a verdict in [the nonmoving party's] favor.'"[18]

**Analysis**

¶ 35    Before discussing the merits of the appeals, we address the impact of our prior holding in *USA Power I* to decide whether our determination that issues of fact precluded summary judgment at that point should drive our review of the court's subsequent grant or denial of JNOV. After addressing this issue, we then proceed with (1) PacifiCorp's direct appeal of the trial court's denial of JNOV related to the trade secret issue, (2) USA Power's cross-appeal of various issues related to damages, and, finally, (3) USA Power's direct appeal of the trial court's grant of JNOV on Ms. Williams's breach of her fiduciary duties.

¶ 36    As an initial matter, USA Power has asked us to treat *USA Power I*, as the "law of the case" and therefore determinative of PacifiCorp's and USA Power's direct appeals. For the reasons discussed below, we decline to do so and take this opportunity to clarify the impact that an appellate court's denial of a summary judgment motion on factual grounds has upon a subsequent motion for directed verdict or JNOV. We conclude that the law of the case doctrine does not preclude a trial court from reexamining arguments made in a summary judgment motion if those arguments have been

---

[16] *See DeBry v. Cascade Enters.*, 879 P.2d 1353, 1359 (Utah 1994) (applying the same standard to both a directed verdict and a JNOV).

[17] *Lyon v. Burton*, 2000 UT 19, ¶ 11, 5 P.3d 616.

[18] *DeBry*, 879 P.2d at 1359 (citations omitted).

cast in a different light, such as when a motion is brought after the evidence has been adduced at trial.

¶ 37    "Under the law of the case doctrine, issues resolved by this court on appeal bind the trial court on remand, and generally bind this court should the case return on appeal after remand."[19] The issues that become the law of the case, however, are primarily questions of law, not of fact.[20] Indeed, we have held that in certain circumstances "a decision[] as to a question of fact[] [does not] fall within the [law of the case] rule" at all.[21] This is true because "there is no particular benefit in establishing settled appellate precedent on issues of fact."[22] Thus, although our pronouncements on legal issues are binding as the law of the case, our decisions on factual issues are less compulsory.

¶ 38    In order to provide guidance as to how a lower court should treat a decision on a factual matter by an appellate court, we adopt a standard used in another branch of the law of the case doctrine. When a trial court judge reviews another trial court judge's ruling, the doctrine prevents the second judge from overruling the first.[23] There is an exception to this rule, however, that permits the

---

[19] *Gildea v. Guardian Title Co. of Utah*, 2001 UT 75, ¶ 9, 31 P.3d 543.

[20] *See Utah Dep't of Transp. v. Ivers*, 2009 UT 56, ¶ 12, 218 P.3d 583 ("The mandate rule 'dictates that pronouncements of an appellate court *on legal issues* in a case become the law of the case and must be followed in subsequent proceedings of that case.'" (emphasis added) (citation omitted)); *Francis v. State, Utah Div. of Wildlife Res.*, 2013 UT 65, ¶ 21, 321 P.3d 1089 ("[A] decision of an appellate court constitutes the law of the case only as to *such questions of law* as were involved in the judgment . . . ." (first alteration in original) (emphasis added) (citation omitted)).

[21] *Herriman Irrigation Co. v. Keel*, 69 P. 719, 720 (Utah 1902) (refusing to apply the law of the case doctrine when in an earlier appeal "the judgment [was] reversed and remanded for a new trial because material findings of fact [were] not supported by the proof, and when at the second trial additional evidence [was] offered and admitted").

[22] *Manzanares v. Byington (In re Adoption of Baby B.)*, 2012 UT 35, ¶ 40, 308 P.3d 382.

[23] *See AMS Salt Indus., Inc. v. Magnesium Corp. of Am.*, 942 P.2d 315, 319 (Utah 1997).

second judge to review "the issues decided by the first judge [when they] are presented to the second judge in a 'different light.'"[24] We find this standard to also be appropriate in the context of a trial court's review of factual issues decided by an appellate court because it recognizes the comparative advantage trial courts have over appellate courts in ruling on fact-dependent issues.[25] We accordingly adopt this standard here and hold that the factual issues decided by an appellate court may be revisited by a lower court when they are presented to the lower court in a "different light."

¶ 39　The "different light" standard is satisfied when the "factual and legal posture of the case has . . . changed" since the initial decision was rendered.[26] Examples of such changes include situations where the parties conduct additional relevant discovery,[27] an appellate decision clarifies the applicable law,[28] a party changes the underlying theory of the case or motion,[29] or the parties adduce

---

[24] *Id.* (citation omitted).

[25] *See Manzanares*, 2012 UT 35, ¶ 40.

[26] *Red Flame, Inc. v. Martinez*, 2000 UT 22, ¶¶ 4–5, 996 P.2d 540.

[27] *See, e.g., AMS*, 942 P.2d at 319 (holding that the second judge in the case properly granted the defendant's second summary judgment motion because there had been two years of extensive discovery and a full hearing between motions); *Hammer v. Gibbons & Reed Co.*, 510 P.2d 1104, 1105 (Utah 1973) ("Although the making of repeated motions for the same relief under the same circumstances might be considered a contempt of court, the circumstances in this case were not the same when the second motion was made . . . [because] [t]here had been further discovery and, in addition, a pretrial conference." (footnote omitted)).

[28] *See, e.g., Braddock ex rel. Smith v. Pac. Woodmen Life Ass'n*, 58 P.2d 765, 765 (Utah 1936) (denying petition for rehearing and modifying original decision) [hereinafter *Braddock II*].

[29] *Cf. Bd. of Educ. of Granite Sch. Dist. v. Salt Lake County*, 659 P.2d 1030, 1033 (Utah 1983) (holding that it was error for the second judge in a case to revisit a factual issue because an amendment to the complaint "had no significant effect upon the issue . . . since that issue depended solely upon an interpretation of the statutes in question regardless of the basis of recovery"); *Sittner v. Big Horn Tar Sands & Oil, Inc.*, 692 P.2d 735, 736 (Utah 1984) ("[M]ere citation of additional authority is insufficient to warrant [revisiting a decided

(Continued)

their evidence at trial.[30] We recognize that this standard will frequently be satisfied but caution that a lower court cannot ignore or deviate from an appellate court's decision on a factual issue simply because it "believe[s] that the issue could have been better decided in another fashion."[31] Thus, as we stated in *Braddock ex rel Smith v. Pacific Woodmen Life Ass'n*, a decision on appeal that "there [is] such conflict in the evidence that the [trial] court should have submitted the case to the jury" still "leave[s] the trial court untrammeled at the []trial in passing on motions for nonsuit, directed verdict, or dismissal," so long as the case is presented to the trial court in a different light.[32]

---

issue], at least where the cited authority does not modify the fundamental theory of the motion." (citation omitted)).

[30] *See, e.g., Richardson v. Grand Cent. Corp.*, 572 P.2d 395, 397–98 (Utah 1977) (holding that, although one trial judge had denied the defendant's summary judgment motion, the second judge properly granted a directed verdict motion in favor of the defendant after the plaintiff had an opportunity to present his evidence at trial).

[31] *Thurston v. Box Elder County*, 892 P.2d 1034, 1038 (Utah 1995).

[32] *Braddock II*, 58 P.2d at 765. In the original *Braddock* case, we had reversed judgment entered in favor of the plaintiff after a jury trial because the trial court applied the wrong legal theory. 54 P.2d 1189, 1191–93 (Utah 1936), *reh'g denied and decision modified by Braddock II*, 58 P.2d 765 [hereinafter *Braddock I*]. After clarifying the applicable law, we "decline[d] to direct a dismissal of the action on the present record," holding that "there was such conflict in the evidence that the court should have submitted the case to the jury" under the correct theory. *Braddock II*, 58 P.2d at 765. The defendant petitioned for rehearing, arguing that "[u]nder the rule of the law of the case[,] . . . the language used by us will require the trial court to submit the case to the jury on a retrail in the event the evidence is substantially the same as in this record." *Id.* We denied the petition but clarified the impact of *Braddock I*, stating that the case "should now be retried and an opportunity afforded the parties to present their evidence under the correct theory as announced in our decision. . . . [I]t was and is our intention to leave the trial court untrammeled at the retrial in passing on motions for nonsuit, directed verdict, or dismissal." *Id.* Thus, our determination of a factual issue—whether a dispute of fact existed—did not limit the trial court's ability to decide whether to grant a subsequent motion for directed verdict on the same facts

(Continued)

¶ 40    Applying this standard here, the questions of law decided in *USA Power I* became the law of the case and accordingly could not be relitigated before the trial court.[33] The questions of fact, on the other hand, were necessarily based on the record as it then existed.[34] Our determination that reasonable inferences could be made in USA Power's favor at the summary judgment stage did not mean that later developments in the case, such as the five-week trial, would not cast the evidence and Defendants' arguments in a new light. Indeed, we see no need to detail the ways in which the evidence may have been developed after summary judgment;[35] instead, it is sufficient to recognize that a trial, especially one lasting five weeks, casts the evidence and the case in a significantly different light than the cold record at summary judgment.[36]  Accordingly, the trial court was free

---

because the court would be looking at those facts under a different light—the appropriate legal theory.

[33] The law of the case doctrine obviously does not prohibit a request to overturn prior precedent, but such a request must be made to the same appellate court that issued the prior decision or to a superior court.

[34] *See Standard Oil Co. of Cal. v. United States*, 429 U.S. 17, 18 (1976) ("Like the original district court judgment, the appellate mandate relates to the record and issues then before the court, and does not purport to deal with possible later events.").

[35] We acknowledge but reject the parties' suggestion that a denial of a summary judgment motion becomes the law of the case so long as the evidence introduced at trial is not "substantially different" from that presented in the summary judgment record, a test adopted in other jurisdictions. *See, e.g.*, *Piesco v. Koch*, 12 F.3d 332, 341–42 (2d Cir. 1993) ("[W]hen we have reversed the granting of summary judgment, the district court cannot properly grant judgment as a matter of law on the basis of trial evidence that is not *substantially different*." (emphasis added)). This test does not comport with our approach in *Braddock* and would in effect require parties to argue over the degree the evidence has changed since summary judgment and whether or not that change is sufficiently substantial. Such a requirement does not serve the purpose for the law of the case doctrine—to increase "economy and efficiency" and decrease "delays and difficulties" in litigation. *Thurston*, 892 P.2d at 1037.

[36] *See State v. Pena*, 869 P.2d 932, 936 (Utah 1994) (stating that a trial judge is "in the best position to assess the credibility of witnesses and to derive a sense of the proceedings as a whole,

(Continued)

to rule on Defendants' motions, even though they may have relied on arguments we addressed and rejected on factual grounds in *USA Power I*. By the same token, we review the trial court's rulings on those motions unfettered by our prior decision.

¶ 41    Having established that the lower court was free to revisit factual issues addressed by our previous decision, we turn now to the merits of the various appeals, beginning with PacifiCorp's appeal of the trial court's denial of its JNOV motion.

### PacifiCorp's Direct Appeal

¶ 42    Because *USA Power I* does not dictate the result of this appeal, we now address the merits of PacifiCorp's direct appeal. We first discuss PacifiCorp's claim that we should reverse the trial court's decision to deny its JNOV motion. We uphold the trial court's denial of the JNOV on the trade secrets issue because, although USA Power's vision is somewhat nebulous, there is a basis in the evidence that would allow a reasonable juror to decide that at least some identifiable portion of USA Power's vision met the definition of a trade secret—i.e., that it derived independent value from not being generally known or readily ascertainable. Second, we discuss PacifiCorp's argument that it is entitled to a new trial or remittitur on its unjust enrichment award. We conclude that it is not because there was evidence in the record that, if read in support of the jury's decision, was consistent with the correct legal standard for unjust enrichment damages. Finally, we discuss PacifiCorp's argument that it is entitled to a new trial or remittitur because the trial court failed

---

something an appellate court cannot hope to garner from a cold record"), *abrogated on other grounds by Campbell v. State Farm Mut. Auto. Ins. Co.*, 2001 UT 89, 65 P.3d 1134; *see also Armco Steel Corp. v. Realty Inv. Co.*, 273 F.2d 483, 484–85 (8th Cir. 1960) (holding that summary judgment should be denied "whenever there is the slightest doubt as to the facts," but rejecting the argument that "if it was error to grant summary judgment [on an earlier appeal] then it would likewise be error to direct a verdict or grant a motion for judgment notwithstanding the verdict [on this appeal]" because when "both parties have had an opportunity to adduce all relevant, available evidence so that the trial court is no longer uncertain as to the circumstances of the case, then slight doubt as to the facts is insufficient to avert a directed verdict or a judgment notwithstanding the verdict").

to give the head-start limitation on unjust enrichment. We conclude that the trial court did not abuse its discretion in so refusing.

## I. We Uphold the Trial Court's Denial of PacifiCorp's JNOV Motion

¶ 43    PacifiCorp faces a difficult standard of review in asking us to overturn the trial court's denial of a JNOV and ultimately reverse the jury's verdict. We do not re-weigh the evidence and decide if we think the jury got it right. Instead, we review the record to see if there was at least some basis in the evidence from which a reasonable juror could determine that a trade secret did exist.[37] We conclude that under this standard, there was at least some evidence to support the jury's verdict and thus uphold the denial of the JNOV.

¶ 44    "To establish a claim for misappropriation of trade secrets, USA Power must show '(1) the existence of a trade secret, (2) communication of the trade secret to [PacifiCorp] under an express or implied agreement limiting disclosure of the secret, and (3) [PacifiCorp's] use of the secret that injures [USA Power].'"[38] This appeal deals only with the threshold issue of "whether, in fact, there [was] a trade secret to be misappropriated,"[39] because PacifiCorp did not appeal the jury's finding of misappropriation.[40] Therefore, any argument that goes to PacifiCorp's use of USA Power's information is not relevant to our analysis. It is established for purposes of this appeal that if there was a trade secret, it was misappropriated.

¶ 45    Utah's Uniform Trade Secrets Act defines "trade secret"

as

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other

---

[37] *See ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 2013 UT 24, ¶¶ 18–19, 309 P.3d 201.

[38] *USA Power I*, 2010 UT 31, ¶ 39, 235 P.3d 749 (alterations in original) (citation omitted).

[39] *Id.* ¶ 41 (citation omitted).

[40] While PacifiCorp "does not concede that it misappropriated anything," it chose not to appeal the misappropriation finding "because of space constraints."

persons who can obtain economic value from its disclosure or use; and

(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[41]

The plaintiff bears the burden of proving the existence of a trade secret, and "there is no presumption in his or her favor."[42]

¶ 46   The jury found that PacifiCorp "misappropriated a trade secret possessed by USA Power." PacifiCorp moved for a JNOV, which the trial court denied. PacifiCorp now argues that the trial court wrongly denied its JNOV because (1) USA Power "failed to identify its trade secret with particularity" and because (2) USA Power "failed to prove the existence of a compilation trade secret when all of [USA Power's] vision was either 'generally known' or 'readily ascertainable.'" In order to reverse a denial of a JNOV, PacifiCorp must show that "there was no basis in the evidence to support the jury's verdict."[43]

¶ 47   Below, we discuss each of these claims. First, we discuss PacifiCorp's particularity argument and conclude that, while USA Power was not required to identify its trade secret with particularity, it was required to articulate what about its vision was not "generally known" or "readily ascertainable"—and thus allow the fact-finder to properly apply the statute. Next, we address whether USA Power has met its burden of proving a trade secret existed under the UUTSA. We conclude that it has done so because there is a basis in the evidence to support a jury finding that identifiable portions of USA Power's vision were not generally known or readily ascertainable and derived value from this status. Therefore, we uphold the trial court's denial of PacifiCorp's JNOV motion.

*A. USA Power Sufficiently Identified Its Trade Secrets*

¶ 48   PacifiCorp argues that it is entitled to a JNOV because USA Power did not define its trade secret with the necessary specificity. In contrast, USA Power argues that the "UUTSA does not impose a 'particularity' standard at trial beyond the evidence necessary to meet the statutory trade secret definition." USA Power

---

[41] UTAH CODE § 13-24-2(4).

[42] *CDC Restoration & Constr., LC v. Tradesmen Contractors, LLC*, 2012 UT App 60, ¶ 13, 274 P.3d 317 (citation omitted).

[43] *ASC Utah*, 2013 UT 24, ¶19.

is correct that there is no "particularity" requirement in the UUTSA.[44] The trade secret at issue, however, must be defined in a manner that allows the fact-finder to determine if a trade secret exists under the statute.[45] Under the UUTSA, the fact-finder must determine if information claimed as a trade secret "derives independent economic value" "from not being generally known to" or "readily ascertainable by" those who could "obtain economic value from its disclosure or use."[46] In order to make such a determination, it is necessary for the fact-finder to know what it is that the plaintiff claims is not generally known or readily ascertainable.

¶ 49    Further, we made it clear in *USA Power I* that the plaintiff asserting a compilation trade secret must do more than "point to broad areas of technology and assert that something there must have been secret and misappropriated."[47] Therefore, while USA Power

---

[44] Some states have written a "particularity" requirement into their Trade Secret Acts. In California, for instance, "before commencing discovery related to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity." Cal. Civ. Proc. Code § 2019.210 (West 2016). Indeed, scholars have discussed the potential practical problems that may arise in trade secret cases where particularity is not required, especially in the context of combination or compilation trade secrets. *See, e.g.*, Charles Tait Graves & Brian D. Range, *Identification of Trade Secret Claims in Litigation: Solutions for a Ubiquitous Dispute*, 5 Nw. J. Tech. & Intell. Prop. 68, 77–78, 91–93 (2006); Tait Graves & Alexander Macgillivray, *Combination Trade Secrets and the Logic of Intellectual Property*, 20 Santa Clara Computer & High Tech. L.J. 261, 275 (2004). But if a "particularity" requirement beyond what is present in the statute is to be required in trade secret cases, it is for the legislature to implement. *See Associated Gen. Contractors v. Bd. of Oil, Gas & Mining*, 2001 UT 112, ¶ 30, 38 P.3d 291 ("[W]e will not 'infer substantive terms into the text that are not already there.'" (citation omitted)).

[45] *See Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 611 (Mo. 2006) ("Evidence of purported 'trade secrets' must be more than general assertions, but must be sufficiently specific to allow a determination by the court.").

[46] Utah Code § 13-24-2(4)(a).

[47] 2010 UT 31, ¶ 44 (citation omitted).

did not have to meet a defined "particularity" requirement, it did bear the burden of defining its purported trade secret in a manner that would allow the fact-finder to determine if it met the statutory requirements of the UUTSA.[48]

¶ 50   In this case, USA Power has defined its trade secrets as including both its full Spring Canyon vision and various components of this vision. Specifically, USA Power defined its trade secrets as

> first, the combination of level-1 information validating a gas-fired power plant, sited in Mona, with [information showing that] the Spring Canyon project's . . . specific configuration would be economically viable  (profitable), and could be designed and constructed to be on-line to meet the critical energy demand projected for summer 2005, when no other project could. The choices creating [the Spring Canyon project] compilation included engineering; economic, market, and financial analyses; and choosing the best options from multiple locations, fuel types, fuel sources, transmission options, air pollution considerations, community support, sizes of output, equipment configuration, water  availability, cooling options, business plans, and investment options (the "Choices").

> Within this compilation, [USA Power] had additional trade secrets, described as: (1) technical information about the size, location, configuration, economics, engineering, and assets of [the Spring Canyon project]; (2) business strategies, goals, and plans, including *proformas* describing cost and profitability; and (3) [USA Power's] first-to-market advantage—i.e., the ability to obtain financing and get to market first and block potential competitors.

¶ 51   The trade secrets were contained in the NOI permits, the rezoning request, the three volumes of information USA Power gave

---

[48] *See Utah Med. Prods., Inc. v. Clinical Innovations Assocs., Inc.*, 79 F. Supp. 2d 1290, 1313 (D. Utah 1999) (requiring, in the summary judgment posture, that the plaintiff define the claimed secret in a way that allowed the statute to be meaningfully applied).

to PacifiCorp concerning the project, and in communications between the parties—including written communications, meetings, and phone calls. While some of this information was publicly disclosed, some of it was not. USA Power accordingly argued that its trade secrets consisted of both a compilation trade secret—a trade secret consisting of a compilation of publicly available information[49]—as well as trade secrets consisting of undisclosed information.

¶ 52    This definition of USA Power's trade secrets is sufficient to permit the jury to perform its task. And, as we discuss below, there was a basis in the evidence from which the jury could have found that information that was part of USA Power's vision, including its economic data and business plans, was not generally known or readily ascertainable. It is important to again note the procedural posture of this case. Where we are reviewing the trial court's denial of a JNOV on factual grounds, it is not our role to determine, in the first instance, whether we would conclude USA Power proved that the trade secrets existed; rather we only review the record before us to determine if there was an adequate basis in the evidence to support the jury's verdict.

*B. USA Power Submitted Enough Evidence to Give the Jury Some Basis to Conclude a Trade Secret Existed*

¶ 53    Having decided that we will not impose any particularity requirement beyond that called for by statute and that USA Power sufficiently defined its trade secrets, we now address whether the jury could have reasonably inferred from the evidence presented that a trade secret existed—i.e., that the information USA Power described as trade secrets actually met the statutory standard. For the reasons discussed below, we conclude that the jury could have reasonably done so and thus uphold the trial court's denial of PacifiCorp's JNOV motion.

¶ 54    Under the UUTSA, a trade secret must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its

---

[49] Although, as we discuss below, public disclosure of a trade secret generally destroys its status as a trade secret, we recognized in *USA Power I* that a compilation of publicly available information could qualify as a trade secret. *See infra* Part I.B.1.

disclosure or use."[50] In *USA Power I*, we analyzed "whether an alchemy of information may constitute a trade secret when its separate parts are each generally known and readily ascertainable, but, *when analyzed together* such parts derive independent economic value."[51] We held that, yes, "a compilation of information within the public domain may constitute a trade secret."[52] We also clarified that "[t]he compilation of information already within the public domain, however, must not itself be generally known or readily ascertainable."[53] Also, we stated that the "'generally known or readily ascertainable' standard 'cannot be viewed as whether the information is generally known and readily ascertainable to the general public, but, based on the defendant['s] knowledge and experience, whether the information was known or ascertainable to [the defendant].'"[54]

¶ 55   Although we stated in *USA Power I* that a compilation trade secret may exist even if all of the components of the compilation are publicly disclosed, we need not apply that standard to the case as it comes before us. Based on the evidence that has been developed since summary judgment, it is clear that not all of the elements of USA Power's claimed compilation trade secret were, in fact, publicly disclosed. Therefore, we need not analyze whether USA Power's entire compilation, as a compilation, was generally known or readily ascertainable. Instead, we can look to those components that were not publicly disclosed and decide if the evidence, when viewed in favor of USA Power, would allow a jury to find that these elements of the vision were not generally known or readily ascertainable and thus protected trade secrets.

¶ 56   We conclude that USA Power has provided some basis for the jury to conclude that at least a portion of its overall vision was a trade secret because it "derive[d] independent economic value . . . from not being generally known" or "readily ascertainable" to the defendant.[55] Below, we first discuss why a reasonable juror

---

[50] UTAH CODE § 13-24-2(4)(a).

[51] 2010 UT 31, ¶ 42 (emphasis added).

[52] *Id.* ¶ 45

[53] *Id.* ¶ 44.

[54] *Id.* (alterations in original) (citation omitted).

[55] UTAH CODE § 13-24-2(4)(a).

could have found that at least some portion of USA Power's vision was not generally known; and next discuss why a reasonable juror could also have found that this confidential information was not readily ascertainable. Finally, we briefly discuss why the jury could have found that this information had value because it was not generally known or readily ascertainable.

1. Generally Known

¶ 57   In order to be a trade secret, information must not be generally known—that is "information must be secret from at least some interested parties" and "[f]ull disclosure of the matter at issue without limitations on further circulation of the information requires the legal conclusion that the matter is no longer a trade secret."[56] The party claiming trade secret protection may make partial or limited disclosure of the information without defeating its trade secret status. For instance, the party "may, without losing his protection, communicate it to employees involved in its use. . . . [or] likewise communicate it to others pledged to secrecy."[57] Further, other parties may also have knowledge of the information so long as they also keep it confidential.[58] For instance, if a company claims trade secret status of certain information, a second company's independent development of that same information would not defeat the first company's trade secret claim if the second company also kept the information confidential.

¶ 58   The evidence in this case provided a sufficient basis for the jury to conclude that at least some components of USA Power's vision for its Spring Canyon plant were not generally known. While a significant amount of information had been made public,[59] there is no dispute that some of the information had not been. The parties

---

[56] *Litigating Misappropriation of Trade Secret*, 127 AM. JUR. TRIALS 283, §§ 18–19 (2012).

[57] RESTATEMENT (FIRST) OF TORTS § 757 cmt. b (AM. LAW INST. 1939).

[58] *Id.*

[59] The publicly disclosed information was contained in the two NOIs and the rezoning request. This information included the following plant configuration on a specific site in Mona, Utah: "Natural Gas Fired, 2 GE-7-FA Turbines, 2 HRSGS, 1 Steam Turbine, Combined Cycle, Air Cooled, Air Inlet Chillers, Duct Firing, LAER/SCR, . . . Gas Pipeline, [and] Site Plan."

agree that USA Power gave confidential, non-public information to PacifiCorp, including USA Power's back-up studies validating its publicly disclosed choices and information related to the economic feasibility of its project.[60] The jury could certainly have found that this confidential information was not generally known. Because the jury could have reasonably concluded that the proprietary information that was never publicly disclosed and was the subject of the Confidentiality and Non-Disclosure Agreement between the parties was not generally known, we must now consider whether any of this information was also not readily ascertainable by PacifiCorp.

2. Readily Ascertainable

¶ 59    The UUTSA requires that, in order to prove the existence of a trade secret, the plaintiff must show that the information "derives independent economic value" from not being "generally known" or "readily ascertainable."[61] "Readily ascertainable" is not a defined term in the UUTSA and does not import any specialized meaning,[62] and we therefore give the term its ordinary meaning.[63]

---

[60] The following specific information was not released to the public: "data on the plant cost; data regarding the cost of dry cooling versus wet cooling; data regarding the dry-cooling energy penalty, including any site-specific analyses; temperature- or altitude-specific calculations, including the heat rate; data regarding the dry-cooling parasitic load; data regarding water balances; data regarding water availability or price; data regarding required water use; a fatal flaw analysis; information regarding interconnection queue with PacifiCorp Transmission; information regarding gas pipelines; market data; economic *proformas* or economic analyses showing the costs, demonstrating the plant would be profitable, the extent of profitability, the return on equity, and the ability to obtain financing; or information on [USA Power's] potential equity partners or business plan, all of which remained confidential and valuable."

[61] UTAH CODE § 13-24-2(4)(a).

[62] *See State v. Canton*, 2013 UT 44, ¶ 28, 308 P.3d 517 ("The legislature is entitled to invoke specialized legal terms that carry an extra-ordinary meaning. And when it does so we credit the legal term of art, not the common understanding of the words. Thus, 'when a word or phrase is "transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it."'" (citations omitted)).

The Merriam-Webster Dictionary defines "readily" as "without much difficulty."[64] In *USA Power I*, we articulated factors that a court may consider when deciding if a trade secret exists.[65] These factors, which we drew from the comments to the Restatement of Torts § 757, included "the ease or difficulty with which the information could be properly acquired or duplicated by others."[66]

¶ 60 PacifiCorp argues that its engineering firm, SS&W, permissibly reverse-engineered USA Power's confidential back-up studies from publicly available information. It further argues that the reverse-engineered back-up studies, which took seven weeks and cost $250,000 to develop, were "readily ascertainable" as a matter of law. PacifiCorp also argues that because USA Power had the burden of showing that the reverse-engineered back-up studies were not "readily ascertainable," it was required to submit expert testimony on this issue, which it failed to do.

¶ 61 In response, USA Power makes two arguments. First, it argues that SS&W did not, in fact, reverse-engineer all of the proprietary information in its back-up studies and that the jury had sufficient evidence to conclude that the information that was not reverse-engineered was also not "readily ascertainable." Second, USA Power argues that to the extent SS&W did reverse-engineer its back-up studies, the jury could have permissibly concluded that this information was not "readily ascertainable" because SS&W spent seven weeks and a quarter million dollars to re-create it. Further, USA Power contends that it was not required to provide expert testimony on whether SS&W's efforts meant that the reverse-engineered back-up studies were "readily ascertainable" but instead

---

[63] *See Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d 863 ("It is well settled that when faced with a question of statutory interpretation, 'our primary goal is to evince the true intent and purpose of the Legislature.' 'The best evidence of the legislature's intent is "the plain language of the statute itself."' Thus, '[w]hen interpreting a statute, we assume, absent a contrary indication, that the legislature used each term advisedly according to its ordinary and usually accepted meaning.'" (alteration in original) (citations omitted)).

[64] *Readily*, MERRIAM-WEBSTER DICTIONARY (10th ed. 1998).

[65] *See* 2010 UT 31, ¶ 45.

[66] *Id.* (citation omitted).

was required to provide—and did provide—evidence from which the jury could make this determination.[67]

¶ 62 We conclude, first, that the jury could have reasonably found that PacifiCorp did not actually reverse-engineer all of USA Power's confidential back-up studies and, second, that the jury could have found that the information that was not reverse-engineered was also not readily ascertainable. We discuss each of these issues below. Also, because we conclude that the jury could have found that PacifiCorp did not reverse-engineer all of USA Power's confidential information, we do not address whether the seven week timeframe and $250,000 budget made the reverse-engineered information "readily ascertainable" as a matter of law.

¶ 63 First, we hold that the jury could have reasonably concluded from the evidence that PacifiCorp did not reverse-

---

[67] We also note that in its brief USA Power suggests that use or misappropriation proves the existence of a trade secret, which is not the case. USA Power argues, in part, that the tight time frame to develop an energy source to meet the 2005 energy demand proves that "PacifiCorp used [USA Power's] trade secret as a roadmap" when developing its Currant Creek proposal. This argument focuses largely on PacifiCorp's ability to *use* USA Power's publicly disclosed configuration and studies validating Spring Canyon's economic viability to short cut the level-1 preliminary design phase. Instead of investing millions and spending years determining the configuration and economic viability of the project, USA Power argues that PacifiCorp was able to "steal" its vision and thus create a winning bid for the RFP in a very limited timeframe.

This argument seems to accept that the jury could reasonably infer from PacifiCorp's misuse of the information that this information must not have been generally known or readily ascertainable. Our court of appeals recognized the difficulty with this type of argument in *CDC Restoration & Construction v. Tradesmen Contractors*. 2012 UT App 60. In that case, the court found that accepting such an argument "would in effect create a presumption that trade secret status may be established by use alone." *Id.* ¶ 22. The court concluded that "[d]oing so would collapse the first and third elements of the test—(1) existence of a trade secret and (3) injurious use—into a single element." *Id.* We agree with this analysis and thus recognize that USA Power cannot establish the existence of its trade secret through evidence of misuse.

engineer all of USA Power's confidential information. PacifiCorp argues that USA Power's confidential information, including its back-up studies, were readily ascertainable because it reverse-engineered these studies in a short time period on a relatively small budget. But we conclude that there was a basis in the evidence for the jury to reasonably infer that PacifiCorp did not, in fact, reverse-engineer all of USA Power's confidential back-up studies. In discussing its consultant's efforts to reverse-engineer USA Power's information, PacifiCorp said SS&W provided "engineering services" such as "detailed cost estimates, analysis of wet versus dry cooling, including the energy penalty, water balances, and heat balances." Essentially, PacifiCorp argued that SS&W provided the missing back-up engineering that PacifiCorp would need to place a bid in the RFP.

¶ 64  But USA Power certainly provided additional confidential information that SS&W did not reverse-engineer. For instance, viewing the evidence in the light most favorable to the verdict we have to assume that all of the following information, which was claimed as a trade secret, was not publicly disclosed:

> data on the plant cost; data regarding the cost of dry cooling versus wet cooling; data regarding the dry-cooling energy penalty, including any site-specific analyses; temperature- or altitude-specific calculations, including the heat rate; data regarding the dry-cooling parasitic load; data regarding water balances; data regarding water availability or price; data regarding required water use; a fatal flaw analysis; information regarding the interconnection queue with PacifiCorp Transmission; information regarding gas pipelines; market data; economic *proformas* or economic analyses showing the costs, demonstrating the plant would be profitable, the extent of profitability, the return on equity, and the ability to obtain financing; [and] information on [USA Power's] potential equity partners or business plan.

¶ 65  Although PacifiCorp may have been able to permissibly reverse-engineer certain pieces of the above information, it was reasonable for the jury to infer that it could not ascertain all of USA Power's private information through reverse-engineering. For instance, it would be reasonable for the jury to find that PacifiCorp did not reverse-engineer USA Power's confidential economic analyses, financing information, potential business partners, and specific business plan. This is especially true given that this

information included economic data prepared by USA Power from its own unique perspective. [68]

¶ 66   Second, given that it was reasonable to find that PacifiCorp did not reverse-engineer all of USA Power's confidential information, the issue becomes whether the information that was not reverse-engineered was also not readily ascertainable. We conclude that it was reasonable for the jury to find that it was not. USA Power presented evidence that the confidential information that was not reverse-engineered included, among other material, economic analyses showing the cost associated with the project, the extent of profitability, and the return on equity, as well as USA Power's potential equity partners and business plan. All of these analyses were done from the unique perspective of USA Power. It was reasonable to infer that this information was not "readily ascertainable."[69]

¶ 67   As discussed above, something is "readily" ascertainable when it can be determined "without much difficulty" through proper means. It is doubtful that PacifiCorp could have obtained USA Power's proprietary economic analysis and business plans through proper methods—likely making this information not ascertainable at all. And it was certainly reasonable for the jury to conclude that PacifiCorp could not have ascertained such information without much difficulty. Further, we conclude that USA Power was not required to present expert testimony that this information was not readily ascertainable. Whether information is readily ascertainable is an issue for the jury, which requires them to apply the facts presented to the correct legal standard. Here, there was certainly enough evidence presented to determine that USA

---

[68] Further, whether PacifiCorp actually used USA Power's private data to compile its own bid is irrelevant to the threshold issue we are asked to address—whether a trade secret existed. It would be relevant to the element of misappropriation, but that issue has not been appealed. Therefore, it is immaterial that USA Power's "customized proformas for [Spring Canyon] as a merchant plant were irrelevant to PacifiCorp's different economic analysis for [Currant Creek] as a public utility."

[69] See UTAH CODE § 13-24-2(4)(a).

Power's proprietary business information was not readily ascertainable.[70]

3. Economic Value

¶ 68    Because we conclude that there was information within USA Power's vision that was not generally known or readily ascertainable, we now address whether this information had value as required by the UUTSA. In order to be a trade secret, information must "derive[] independent economic value, *actual or potential*, from not being generally known" or "readily ascertainable" to the defendant.[71] USA Power argued, and it was reasonable for the jury to conclude, that its confidential economic information and business strategies were valuable to PacifiCorp in the RFP process. From this information, USA Power argued that PacifiCorp could infer USA Power's potential bid in the RFP, giving it a "price to beat." Certainly, it is reasonable for the jury to find that this information had value to PacifiCorp when PacifiCorp and USA Power were submitting competing bids in the same competitive process and where there was evidence suggesting that this confidential information would provide PacifiCorp with a "price to beat."

¶ 69    PacifiCorp's position is that knowing its competitors' internal financial data had no actual or potential value. But while PacifiCorp certainly had access to its own internal financial calculations and assessments, having access to USA Power's internal financial assessments is another matter altogether. It can hardly be argued that, in a bidding contest, for one competitor to have access to another competitor's internal financial calculations—calculations that will certainly bear upon that competitor's ultimate bid—would have obvious value. Such financial information is a paradigmatic example of a trade secret.

¶ 70    We, therefore, conclude that there was sufficient evidence in the record from which the jury could infer that a trade secret existed. That is, the jury could have concluded that specific portions of USA Power's confidential information were not generally known or readily ascertainable and that they "derived independent economic value, actual or potential" from this status. Because there

---

[70] Because we decide this issue on alternative grounds, we do not directly address PacifiCorp's claim that USA Power was required to present expert testimony on whether the information it did reverse-engineer was readily ascertainable.

[71] UTAH CODE § 13-24-2(4)(a) (emphasis added).

was a basis in the evidence to support the verdict, we uphold the trial court's denial of PacifiCorp's JNOV motion on the trade secret issue.

## II. The Trial Court Did Not Abuse Its Discretion in Denying PacifiCorp's Motion for a New Trial or Remittitur

¶ 71   Having concluded that the jury could have reasonably found that a trade secret existed, we now address PacifiCorp's argument that the jury's unjust enrichment award was unsupported. Under the UUTSA, "[d]amages can include both the actual loss caused by misappropriation and the unjust enrichment caused by the misappropriation that is not taken into account in computing actual loss."[72] But unjust enrichment damages are limited to the value added to the project by the misappropriated trade secret.[73] PacifiCorp argues that while the jury was properly instructed,[74] it improperly "awarded [USA Power] 100% of PacifiCorp's profits as unjust enrichment, despite indisputable evidence that PacifiCorp made substantial independent contributions" to the Currant Creek project. We have emphasized that "[j]uries are generally allowed wide discretion in the assessment of damages."[75] Further, our standard of review when considering a trial court's decision to deny a rule 59 request for a new trial is deferential—we will reverse only if there "is no reasonable basis for the decision."[76]

---

[72] UTAH CODE § 13-24-4(1).

[73] *See Russo v. Ballard Med. Prods.*, 550 F.3d 1004, 1018 (10th Cir. 2008) (recognizing the ability of the plaintiff "to recover the full incremental value added by [the defendant's] misappropriated trade secret" under the UUTSA).

[74] The jury was instructed that unjust enrichment was limited to "the reasonable value of the benefit that [PacifiCorp] gained from . . . using the trade secret" and that the unjust enrichment award must exclude profits attributable to PacifiCorp's "own independent efforts, skills, expertise, knowledge, innovation, and investment."

[75] *Judd v. Drezga*, 2004 UT 91, ¶ 62, 103 P.3d 135 (alteration in original) (citation omitted).

[76] *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 805 (Utah 1991) ("In reviewing the judge's ultimate decision to grant or deny a new trial, we will reverse only if there is no reasonable basis for the decision. For example, even if the jury's award appears supported by
(Continued)

¶ 72 We conclude that PacifiCorp's argument is unavailing because the jury could have reasonably inferred from the evidence USA Power presented that only one plant was possible in Mona, that misappropriation caused this plant to be Currant Creek instead of Spring Canyon, and, therefore, that all of PacifiCorp's profits were the result of misappropriation. As discussed above, the jury could have found that by misappropriating USA Power's confidential financial information—by knowing the "price to beat"—PacifiCorp gained a critical competitive advantage in the RFP process. If we view the evidence in the light most favorable to the jury verdict, we conclude it was reasonable for the jury to infer that this misappropriation caused USA Power to lose the RFP.[77]

¶ 73 The trial court concluded both that "the plaintiff's theory . . . that there was only one plant that could be built" was "not illogical," and that "if there's only going to be one plant built, it's not illogical to assume that if misappropriation of the trade secrets allowed Currant Creek to be that plant, that all the profits associated with Currant Creek are attributable to the misappropriation." Given that the jury could have believed that only one plant could have been built in Mona, its decision to award USA Power all of PacifiCorp's profits would not have been against the law set forth in the jury instructions.[78] Thus it was not an abuse of discretion for the trial court to deny PacifiCorp's motion for a new trial.

---

substantial evidence on appeal, if the trial court could reasonably conclude that the jury had acted in a manner covered by the grounds stated in rule 59(a)(5) or (6), an order granting a new trial will be upheld on appeal. Similarly, a trial court's decision to deny a new trial will be upheld if there is a reasonable basis to support the decision." (footnote and citations omitted).)

[77] PacifiCorp's arguments on appeal related to causation are limited to its claim that there was insufficient evidence for the jury to find that any misappropriation by PacifiCorp rendered "100% of PacifiCorp's profits as unjust enrichment"—i.e., that the evidence supported finding only some, not all, of PacifiCorp's profits to be unjust. It has not appealed the jury's finding of misappropriation, the finding that such misappropriation caused USA Power to lose the RFP (its actual damages), or the finding that such misappropriation caused PacifiCorp to be unjustly enriched in some amount.

[78] *See* UTAH R. CIV. P. 59; *Child v. Gonda*, 972 P.2d 425, 433 (Utah 1998).

### III. The Trial Court Did Not Abuse Its Discretion in Refusing to Give the Head-Start Jury Instruction

¶ 74    The final issue PacifiCorp presents on appeal is a challenge to the trial court's decision not to give the head start jury instruction. The trial court refused to give PacifiCorp's proposed instruction to the jury and also denied PacifiCorp's "motion for a new trial for excessive damages on that ground." We conclude that it was not an abuse of discretion for the trial court to decline to give the proposed head-start jury instruction because the instruction that was given correctly articulated the law and because the jury could have concluded that the parties were competing over a single economic opportunity—thus finding that PacifiCorp's head start gave it entire control over that opportunity.

¶ 75    We review a trial court's "refusal to give a jury instruction for abuse of discretion."[79] Abuse of discretion may be present when a trial court "relied on 'an erroneous conclusion of law'" or where there was "no evidentiary basis for the trial court's ruling."[80] We have held that in certain circumstances the court's discretion in declining to give jury instructions "will be strictly cabined."[81] These circumstances are not at issue in this case, as we discuss below.[82] Further, when assessing the decision to decline to give jury instructions, "we look at the jury instructions 'in their entirety and will affirm when the instructions taken as a whole fairly instruct the jury on the law applicable to the case.'"[83] And "a trial court does not

---

[79] *Miller v. Utah Dep't of Transp.*, 2012 UT 54, ¶ 13, 285 P.3d 1208.

[80] *Daniels v. Gamma W. Brachytherapy, LLC*, 2009 UT 66, ¶ 32, 221 P.3d 256 (citation omitted).

[81] *Miller*, 2012 UT 54, ¶ 13.

[82] Generally, discretion is cabined under two circumstances. First, when a criminal defendant's ability to have the charged offense defined for the jury is at issue; and second when a party's ability to present its theory of the case to the jury is at issue. *Id.* Here, the first circumstance is clearly not applicable, and we conclude that the second also does not apply. As we discuss, PacifiCorp had the ability to argue for limiting damages under the instruction presented to the jury.

[83] *State v. Maestas*, 2012 UT 46, ¶ 148, 299 P.3d 892 (citation omitted).

err by refusing a proposed instruction 'if the point is properly covered in other instructions.'"[84]

¶ 76    Here, PacifiCorp requested the following proposed instruction:

> You may only award actual and unjust enrichment damages for a time period equal to the amount of time (1) you find that it would take, or did take, any competitor, including PacifiCorp, to develop the trade secret independently, plus (2) any additional period, if any, that you find that the trade secret afforded PacifiCorp a competitive advantage, such as providing PacifiCorp a head start in its business.

The jury instruction given by the court stated:

> "Unjust enrichment" means the reasonable value of the benefit that the party who misappropriated the trade secret has gained from disclosing or using the trade secret. A defendant's profits may be an indication of unjust enrichment, but if you use PacifiCorp's profits to calculate an amount of unjust enrichment, you must use the profits which are attributable to the misappropriation. You may not include as damages those profits that are attributable to PacifiCorp's own independent efforts, skill, expertise, knowledge, innovation, and investment.

¶ 77    We conclude that under the instruction that was given, PacifiCorp was free to argue its head-start theory—that after the initial head-start period, the remaining life of the plant was "attributable to PacifiCorp's own independent efforts, skill, expertise, knowledge, innovation, and investment." While "head start" was not specifically mentioned in the actual jury instruction, this is insufficient to conclude that the instruction denied PacifiCorp the ability to present its theory to the jury.

¶ 78    Because PacifiCorp could have presented its theory to the jury, we review the trial court's decision under the general abuse of discretion standard instead of a "cabined" one. Under the abuse of discretion standard, we conclude that the trial court's decision to deny PacifiCorp's proposed instruction was not grounded in an

---

[84] *Id.* (citation omitted).

erroneous understanding of the law nor did it lack an evidentiary basis.[85]

¶ 79    Further, in assessing the evidence, a jury could have concluded that the parties were competing over a single economic opportunity. PacifiCorp's head start essentially gave it entire control over that opportunity. Such control afforded PacifiCorp a perpetual competitive advantage as it precluded USA Power from constructing its own plant. Consequently, a reasonable jury could have determined that PacifiCorp's head start was the sole cause of the total amount of the unjust enrichment damages. Accordingly, we hold that the trial court did not abuse its discretion by refusing to give the head-start jury instruction.

¶ 80    In sum, on PacifiCorp's direct appeal, we uphold the trial court's denial of PacifiCorp's JNOV on the trade secret issue because the jury could have reasonably inferred from the evidence, viewed in favor of the verdict, that a trade secret existed. We deny PacifiCorp's request for a new trial or remittitur on the apportionment of unjust enrichment damages and on the trial court's decision not to give the jury its head-start jury instruction.

### USA Power's Cross-Appeal

¶ 81    Having affirmed the trial court on each issue raised by PacifiCorp, we must now address the various issues related to damages raised by USA Power in its cross-appeal. USA Power asserts five claims:  (1) the trial court improperly reduced the damages awarded to USA Power against PacifiCorp; (2) the trial court erred in denying exemplary damages; (3) the trial court erred by using the lodestar method to calculate the amount of attorney fees awarded to USA Power; (4) the trial court erred in denying prejudgment interest;[86] and (5) the trial court erred by applying an incorrect interest rate to the contract damages. Although USA Power

---

[85] We also note that the trial court concluded that PacifiCorp had failed to adequately present a head-start theory during trial, stating that "I just didn't have the chance to address it at the trial level."

[86] USA Power presents two alternative arguments in relation to prejudgment interest: first, that it was due prejudgment interest beginning at some point prior to the verdict—though it does not specify the date—or, second, that it was due prejudgment interest from the date of the verdict. These arguments will be addressed together.

has provided scant legal authority for the majority of its arguments in this cross-appeal, and often fails to provide any analysis of the issues other than conclusory statements, we address the issues to the extent necessary to provide clarification. Ultimately, we affirm the trial court on all points.

## I. The Trial Court Did Not Abuse Its Discretion in Granting a Remittitur

¶ 82    The first claim asserted by USA Power in its cross-appeal is that the trial court erred in granting a remittitur reducing the unjust enrichment damages awarded by the jury. The jury awarded USA Power both actual damages—$21,399,391—and unjust enrichment damages—$112,500,000. The trial court reduced the unjust enrichment award pursuant to a rule 59 motion for new trial, finding that the jury had awarded overlapping damages. The UUTSA allows a plaintiff to recover "both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation."[87] The unjust enrichment award cannot, however, take "into account [damages awarded] in computing actual loss."[88] As a comment to the model Uniform Trade Secrets Act describes, there is "an express prohibition upon the counting of the same item as both a loss to a complainant and an unjust benefit to a misappropriator."[89] USA Power argues that because the jury was instructed that unjust enrichment damages could not overlap actual damages—and there was evidence that PacifiCorp's profit was far greater than what was awarded—we must presume that the jury properly calculated damages and conclude that the trial court abused its discretion in granting a remittitur. We disagree.

¶ 83    The trial court apparently granted the remittitur based on rule 59(a)(6), which permits a new trial or a remittitur to be granted when the verdict is "against law,"[90] including "the law set forth in the jury instructions."[91] The parties agree that the jury was properly

---

[87] Utah Code § 13-24-4(1).

[88] *Id.*

[89] Unif. Trade Secrets Act § 3 cmt (Unif. Law Comm'n 1985).

[90] Utah R. Civ. P. 59(a)(6) (2015).

[91] *Child v. Gonda*, 972 P.2d 425, 433 (Utah 1998). Although we note that the trial court did not expressly base its decision to grant a remittitur on one of the grounds listed in rule 59, this omission is not necessarily fatal to its decision so long as the basis for the decision is

(Continued)

instructed that an award of damages for unjust enrichment cannot take into account damages awarded in computing actual loss. Thus, the issue is not a question of whether the jury instruction was correct or whether the trial court applied an incorrect interpretation of the law to the evidence,[92] which would involve legal questions reviewed for correctness,[93] but whether the evidence presented could support the award of damages in a way that did not violate the law given in the jury instructions. Because this is an evidentiary question, we review for abuse of discretion, as discussed below.

¶ 84   Although it is true that "[j]uries are generally allowed wide discretion in the assessment of damages,"[94] we have also recognized that "[i]n the context of a . . . motion attacking the amount of a jury verdict under [rule 59(a)(6)], it is the responsibility of the trial court to review the amount of the award to ensure that

---

apparent from the record, as in this case. *See Braithwaite v. W. Valley City Corp.*, 921 P.2d 997, 1001 (Utah 1996).

[92] USA Power argues that the trial court applied the wrong legal standard to determine whether the jury had improperly awarded overlapping damages, claiming that USA Power's "actual loss was not the 'same item' as the unjust enrichment." But USA Power's argument is not supported with any analysis or legal authority explaining how we should interpret the phrase "same item" and is, therefore, inadequately briefed. USA Power also fails to address the cases cited by PacifiCorp suggesting that a double recovery occurs when a plaintiff recovers both actual damages and unjust profits from the same lost opportunity without a reduction. *See, e.g.*, *Taylor v. Meirick*, 712 F.2d 1112, 1120 (7th Cir. 1983). We accordingly do not address this issue further. *See Hess v. Canberra Dev. Co.*, 2011 UT 22, ¶ 25, 254 P.3d 161 (stating that we do not address issues where the briefing lacks "meaningful legal analysis," such as a lack of citation and development of legal authority (citation omitted)).

[93] *See Harvey v. Cedar Hills City*, 2010 UT 12, ¶ 10, 227 P.3d 256. Although we review fact-like mixed determinations under a deferential standard of review, *see Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶¶ 37–38, 308 P.3d 461, "[a]n abuse of discretion may be demonstrated by showing that the district court relied on 'an erroneous conclusion of law,'" *Kilpatrick v. Bullough Abatement, Inc.*, 2008 UT 82, ¶ 23, 199 P.3d 957 (citation omitted).

[94] *Hess*, 2011 UT 22, ¶ 41 (alteration in original) (citation omitted).

the jury has acted within its proper bounds."[95] "Having been present for all phases of the trial, the trial judge is in the best position to ascertain if the jury has 'exceeded its proper bounds,' and we will reverse 'only if there is no reasonable basis for the decision.'"[96] Accordingly, we review the trial court's determination that the verdict was "against law" under an abuse of discretion standard.[97] And "[i]n case of doubt, the deliberate action of the trial court should prevail."[98]

¶ 85    The trial court, after having been present for a five-week trial and having reviewed hundreds if not thousands of pages of evidence, determined that "the jury awarded to the penny the amount of the anticipated profits from Spring Canyon, and awarded to the penny the anticipated profits from Currant Creek" and found that "it's clear that both of those could not have been achieved simultaneously." The court's logic is reasonable. If no misappropriation had occurred and USA Power had won the bid,

---

[95] *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 804 (Utah 1991).

[96] *Diversified Holdings, L.C. v. Turner*, 2002 UT 129, ¶ 4, 63 P.3d 686 (citations omitted); *see also Crookston*, 817 P.2d at 804 ("The reason that any determination as to whether the jury exceeded its proper bounds is best made in the first instance by the trial court is that the trial judge is present during all aspects of the trial and listens to and views all witnesses. Therefore, he or she can best determine if the jury has acted with 'passion or prejudice' and whether the award was too small or too large in light of the evidence. The trial judge is free to grant or deny a motion for a new trial if it is reasonable to conclude that the jury erred.").

[97] *See ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 2013 UT 24, ¶¶ 21–22, 309 P.3d 201 ("A motion for a new trial [or remittitur] 'invokes the sound discretion of the trial court, and appellate review of its ruling is quite limited.' . . . The district judge who presided over a trial is in a far better position than an appellate court to determine, for example, whether the evidence was sufficient to justify the verdict or whether the jury awarded damages 'under the influence of passion or prejudice[]' [pursuant to rules 59(a)(5) and (6).] This is particularly true in the present case, where the record is thousands of pages long, the trial transcripts cover seven weeks of testimony and presentation of evidence, and the pre-trial litigation spanned several years." (citations omitted)).

[98] *Crookston*, 817 P.2d at 806 (citation omitted).

the amount it would have been paid under its various contracts—the actual damages of $21 million that it was awarded—would have surely come from the completed project's profits. Thus, USA Power's actual damages may account for some of the unjust profits PacifiCorp retained, as those profits would have been due to USA Power under the contracts that would have been executed. The trial judge was in the best position to determine whether "the jury ha[d] exceeded its proper bounds," and the judge's determination that the jury had indeed done so by awarding overlapping damages that were impermissible under the given jury instructions was based on a reasonable evaluation of the evidence presented to the jury. As there is a reasoned basis for the trial court's deliberate action, we see no abuse of discretion and accordingly affirm the trial court's grant of remittitur.

## II. The Trial Court Did Not Abuse Its Discretion by Denying Exemplary Damages

¶ 86    USA Power's second argument is that the trial court erred by denying USA Power's request for exemplary damages. Under the UUTSA, "[i]f willful and malicious misappropriation exists, the court may award exemplary damages."[99] This statute is discretionary—it states that exemplary damages *may* be awarded upon a finding of willfulness, not that they must be.[100] Thus, "[t]he law is clear that while willful [misappropriation] may allow enhanced damages, such a finding does not compel the district court to grant them. Instead, the decision to grant or deny enhanced damages remains firmly within the scope of the district court's reasoned discretion."[101] So long as the trial court applied the right legal standard to its decision,

---

[99] UTAH CODE § 13-24-4(2).

[100] *Cf. Bilanzich v. Lonetti,* 2007 UT 26, ¶ 17, 160 P.2d 1041 ("We note, however, that the language of the statute is not mandatory but allows courts to exercise discretion in awarding attorney fees and costs.").

[101] *Odetics, Inc. v. Storage Tech. Corp.,* 185 F.3d 1259, 1274 (Fed. Cir. 1999) (citation omitted); *see also Cybor Corp. v. FAS Tech., Inc.,* 138 F.3d 1448, 1461 (Fed. Cir. 1998) ("[T]here is no merit to the argument that a finding of willfulness but a denial of enhanced damages is necessarily an abuse of discretion.").

we review its decision to deny exemplary damages for abuse of discretion.[102]

¶ 87 USA Power claims that the trial court erred in not evaluating its request under the proper standard, the *Read* factors,[103] and instead applied an unpermitted standard that overruled the jury's verdict.[104] The first problem with USA Power's argument is that the law is well established that while the *Read* factors are helpful, the appropriate legal standard is a consideration of "the totality of the circumstances."[105] The second problem is that the trial court did analyze the case using the *Read* factors and did incorporate the jury's verdict into its analysis—facts that USA Power failed to address in its opening brief.[106] Although the trial court did look to other relevant considerations, such as whether the jury verdict alone would fulfill the purpose of an award of exemplary damages, such considerations are entirely appropriate under the totality of the circumstances test. Because the court used the correct standard, we review its decision to deny exemplary damages for abuse of

---

[102] *See Crookston v. Fire Ins. Exch.*, 860 P.2d 937, 939–40 (Utah 1993).

[103] *See Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827–28 (Fed. Cir. 1992).

[104] USA Power criticizes the trial court for stating that "[t]o me, discretion, if it means anything, means that I have to, in my heart, feel good about the result, feel like I've done the right thing." Although basing a decision on whether the judge "feel[s] good about the result" would be an inappropriate way to approach this issue, this statement does not encompass the trial court's full approach to this issue. The trial court clearly addressed the *Read* factors in light of the totality of the circumstances of the case.

[105] *In re Seagate Tech., LLC*, 497 F.3d 1360, 1369 (Fed. Cir. 2007) (citing *Read*, 970 F.2d at 826–27); *Odetics*, 185 F.3d at 1274 (Fed. Cir. 1999) ("Our review of the district court's reasoning is mindful that, in this context, a 'broad range of discretion is reposed in the trial court, founded on [the] need to weigh and balance multiple factors in determining a just remedy.'" (alteration in original) (citation omitted)); *Cybor Corp.*, 138 F.3d at 1461 (stating that an award of exemplary damages is determined "based on all the facts and circumstances" (quoting *Read*, 970 F.2d at 826)).

[106] The trial court said, "I find [the *Read* factors] not to be a really helpful fit with the facts of this case, but I think that we need to go through them, in any event."

discretion, "mindful that, in this context, a 'broad range of discretion is reposed in the trial court, founded on [the] need to weigh and balance multiple factors in determining a just remedy.'"[107]

¶ 88    In reviewing the trial court's decision, we begin with the *Read* factors, though we again emphasize that these factors are to be used only insofar as they are helpful to a trial court's analysis. There are nine factors: (1) the deliberateness of the defendant's actions; (2) the defendant's good-faith belief that it was not misappropriating a trade secret; (3) the defendant's behavior as a party in litigation; (4) the defendant's size and financial condition; (5) the closeness of the case; (6) the duration of the defendant's misconduct; (7) the presence of any remedial action by the defendant; (8) the defendant's motivation for harm; and (9) the defendant's attempts to conceal its misconduct.[108]

¶ 89    The court considered each of these factors as well as the purpose for exemplary damages in denying USA Power's request. Further, the court did not "second guess[] the jury."[109] It properly considered the jury's verdict as dispositive of certain factors. The court determined that certain factors, including those it concluded were necessarily established by the jury's verdict,[110] weighed in favor of an award of exemplary damages,[111] while other factors

---

[107] *Odetics, Inc.*, 185 F.3d at 1274 (alteration in original) (citation omitted).

[108] *See Read*, 970 F.2d at 827–28.

[109] *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1572 (Fed. Cir. 1996).

[110] The court appropriately concluded that the first and second factors—deliberateness and good faith—were necessarily determined to weigh in favor of exemplary damages by the jury's verdict. *See Jurgens*, 80 F.3d at 1572 ("In returning its verdict of willfulness, the jury necessarily decided that CBK had acted in bad faith . . . ."). USA Power seems to argue that the jury's finding of willful misconduct almost creates a presumption that exemplary damages are appropriate. As we noted above, although a finding of willful and malicious action is a necessary element of an award of exemplary damages, it is not necessarily a sufficient one.

[111] The parties agree that the fourth factor, the size and financial position of PacifiCorp, weighs in favor of exemplary damages. Further, as to the seventh factor—remedial action—the trial court

(Continued)

either cut against such an award[112] or were less relevant to the case.[113] In addition to these factors, and in accordance with its duty to determine whether exemplary damages should be awarded in light of the totality of the circumstances, the trial court also considered the policy behind an award of exemplary damages—deterrence of future misappropriation.[114] The trial court reasoned

---

concluded there was "[e]ssentially none." A lack of remedial action favors an award of exemplary damages.

[112] These included the third, fifth, and sixth factors—litigation conduct, the closeness of the case, and duration of misconduct. As to PacifiCorp's litigation behavior, the trial court stated that it "ha[d] nothing to criticize about PacifiCorp's conduct at the litigation." The trial court was in the best position to determine this issue and deference to this finding is warranted. *See Cybor Corp.*, 138 F.3d at 1461 ("Finally, nothing in the record supports FAS's arguments that Cybor litigated in an inappropriate fashion; the district court actually found the contrary to be true."). As to the closeness of the case, the court stated that it "th[ought] that this [was] a very close case on the question of the existence of a trade secret," a key element of USA Power's case. We agree that, though USA Power may have been successful on each of its claims, "this result does not mean that the case was not close," because PacifiCorp's arguments "were not meritless, and resolution of those issues in [USA Power's] favor was far from a foregone conclusion." *Id.* And as to duration of misconduct, the trial court noted that "[t]he duration of the defendants' conduct . . . was really focused on a very brief period," and seemed to consider this factor to cut against exemplary damages. Because USA Power failed to address the court's consideration of this factor in its opening brief, we defer to the court's analysis.

[113] The trial court determined that the eighth and ninth factors—motivation for harm and concealment of misconduct—were not particularly relevant to the case. USA Power fails to provide any legal authority for how these factors should be considered or why they are relevant to the case. Accordingly, we defer to the trial court's consideration of these factors.

[114] *See Terry v. Zions Coop. Mercantile Inst.*, 605 P.2d 314, 328 (Utah 1979), *overruled on other grounds by McFarland v. Skaggs Cos.*, 678 P.2d 298 (Utah 1984) ("The purpose of a punitive or exemplary damage award is not to compensate the party harmed but rather to punish the wrongdoer, to deter him from similar acts in the future, and to

(Continued)

that the jury award of over $100 million, including unjust enrichment, would be sufficient to satisfy the policy.[115] The countervailing factors present in this case do not persuade us that the trial court abused its discretion in denying USA Power's request for exemplary damages, and we accordingly affirm its decision.

### III. The Trial Court Correctly Employed the Lodestar Method to Calculate USA Power's Attorney Fees

¶ 90    Next, USA Power argues that the trial court erred in employing the "lodestar method" of calculating attorney fees rather than relying on the contingency fee percentage agreed to by USA Power. Under the UUTSA, "[i]f . . . willful and malicious misappropriation exists, the court *may* award reasonable attorneys' fees to the prevailing party."[116] As with an award of exemplary damages, the permissive language of the statute allows a court to award fees in its discretion.[117] The court may use its discretion to determine both whether an award of attorney fees should be made[118] and, if so, what the amount should be.[119] Thus, as with exemplary

---

provide fair warning to others similarly situated that such conduct is not tolerated.").

[115] *See S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2nd Cir. 1996) ("[T]he primary purpose of disgorgement . . . is deterrence, through prevention of unjust enrichment on the part of the violator.").

[116] UTAH CODE § 13-24-5 (emphasis added).

[117] *Bilanzich v. Lonetti*, 2007 UT 26, ¶ 17, 160 P.3d 1041 ("We note, however, that the language of the statute is not mandatory but allows courts to exercise discretion in awarding attorney fees and costs.").

[118] *Id.* ("Under the plain language of Utah Code section 78–27–56.5, '[a] court *may* award costs and attorney's fees,' but *is not required to do so*. In interpreting the Utah Arbitration Act, which contains a similarly worded attorney fees provision, we have held that the use of the word 'may' indicates that the court has discretion in awarding fees." (alteration in original) (second emphasis added) (citations omitted)).

[119] *Id.* ¶ 21 ("Section 78–27–56.5's use of the word 'may' also indicates that courts have broad discretion in applying equitable principles in fixing the amount of any award of fees under the statute.").

damages, "[a] trial court's conclusion as to what constitutes a reasonable attorney fee award is reviewed for an abuse of discretion"[120] so long as the trial court has employed the proper standard.[121]

¶ 91    The parties argue over the method that should be used to calculate attorney fees. USA Power argues for an award based entirely on its contingency fee arrangement, while PacifiCorp argues that the trial court's use of the lodestar method was appropriate. USA Power asserts that it should have been awarded the full amount of its contingency fee based on prior cases approving contingency fee awards and the policy that an award of attorney fees should "indemnify the prevailing party."[122] PacifiCorp counters that the lodestar method,[123] which was the method actually used by the trial court, is the usual method used in calculating attorney fees.

¶ 92  PacifiCorp is correct. The lodestar method is the traditional approach to calculating attorney fees.[124] And though, as USA Power has argued, we have occasionally permitted a contingency fee arrangement to form the basis of an award of attorney fees, such circumstances, as discussed below, are rare. Accordingly, the trial court did not err in employing the traditional lodestar method as its standard for awarding fees. And in light of USA Power's acknowledgment that "the only issue is whether the court applied the wrong legal standard"—and not whether the

---

[120] *Campbell v. State Farm Mut. Auto. Ins. Co.*, 2001 UT 89, ¶ 125, 65 P.3d 1134, *rev'd on other grounds*, 538 U.S. 408 (2003).

[121] *See Crookston v. Fire Ins. Exch.*, 860 P.2d 937, 939–40 (Utah 1993).

[122] *Softsolutions, Inc. v. Brigham Young Univ.*, 2000 UT 46, ¶ 51, 1 P.3d 1095.

[123] *See Barker v. Utah Pub. Serv. Comm'n*, 970 P.2d 702, 708 (Utah 1998) ("The lodestar method requires a determination of the hours reasonably expended on the case as well as a reasonable hourly rate for the services. These two amounts are multiplied, and the total is increased or decreased to account for the level of the risk involved in the case and the quality of the work." (citation omitted)).

[124] *See id.* ("As courts often do, we will use the lodestar method in considering the attorney fees in this case.").

award itself was unreasonable[125]—we affirm the trial court's award of attorney fees.

¶ 93    We take this opportunity, however, to provide guidance as to when an award of attorney fees based solely on a contingency fee arrangement is proper, as our prior cases have not expressly addressed this issue. In general, a party may recover attorney fees only when provided for by statute or contract—the so-called American Rule.[126] As noted above, the calculation of attorney fees pursuant to a fee-shifting contract or statute is generally performed through the lodestar method.[127] But there are a limited number of exceptions to the American Rule, some of which permit a party to recover attorney fees as special or consequential damages.[128] We

---

[125] USA Power focuses mainly on the method of calculation used by the trial court, though it also suggests that the award was unreasonable even under the lodestar method because the trial court failed to account for the contingent nature of the case—such as through an adjustment of the hourly rate or the inclusion of a multiplier. This argument is inadequately briefed, however, as well as unpreserved. We accordingly decline to address it.

[126] *See Turtle Mgmt., Inc. v. Haggis Mgmt., Inc.*, 645 P.2d 667, 671 (Utah 1982).

[127] *See Dixie State Bank v. Bracken*, 764 P.2d 985, 988–90 (Utah 1988); *Canyon Country Store v. Bracey*, 781 P.2d 414, 420 (Utah 1989) ("'Reasonableness' is generally the standard when the basis for recovery is a statute or a contract."); *Kealamakia, Inc. v. Kealamakia*, 2009 UT App 148, ¶ 22, 213 P.3d 13 ("Our jurisprudence has mapped out a rather pristine formula for calculating [fees based on statutes or contracts]." (Orme, J., concurring)).

[128] Special damages and consequential damages are two ways of naming the damages that "occur as a natural consequence of the harm done." *Cohn v. J.C. Penney Co.*, 537 P.2d 306, 307 (Utah 1975). "Special damages" is generally the term used in tort law, while "consequential damages" is typically used with contracts, though they are essentially synonymous. *See State v. Corbitt*, 2003 UT App 417, ¶ 21 & n.1, 82 P.3d 211 (Orme, J., concurring). Cases permitting attorney fees to be sought as consequential damages include claims for slander of title, *Neff v. Neff*, 2011 UT 6, ¶¶ 80, 86, 247 P.3d 380, the third-party litigation exception, *Collier v. Heinz*, 827 P.2d 982, 983–84 (Utah Ct. App. 1992), certain employment contracts, *Heslop v. Bank of Utah*, 839 P.2d 828, 840–41 (Utah 1992), and insurance contracts,

(Continued)

have noted that "[t]he award of attorney fees as special damages is separate and distinct" from fees awarded pursuant to a fee-shifting rule, statute, or contract.[129] And the question at issue in cases where attorney fees are sought as consequential damages pursuant to some exception to the American Rule is not whether the fee awards are reasonable, but whether they are foreseeable.[130] As we discuss below, it is this foreseeability requirement that justifies an award based solely on a contingency fee.

¶ 94   We have found, and the parties could point us to, only two cases where we have upheld a fee award based solely on a contingency fee arrangement: *Campbell v. State Farm Mutual Automobile Insurance*[131] and *Billings v. Union Bankers Insurance*.[132] Both involved claims against an insurer and thus fell within the exception to the American Rule permitting attorney fees as

---

*Billings v. Union Bankers Ins.*, 918 P.2d 461, 468 (Utah 1996). Not all exceptions to the American Rule, however, permit or require attorney fees to be sought directly as damages. *See, e.g.*, *Stewart v. Utah Pub. Serv. Comm'n*, 885 P.2d 759, 783 (Utah 1994) (private attorney general exception); *Cafferty v. Hughes*, 2002 UT App 105, ¶ 23, 46 P.3d 233 (violation of trust exception).

[129] *Neff*, 2011 UT 6, ¶ 86 n.68; *see also Canyon Country*, 781 P.2d at 420 (affirming an award of fees as consequential damages and stating that "'[r]easonableness' is generally the standard when the basis for recovery is a statute or contract. As pointed out earlier, however, Canyon Country's claim was based on neither. We hold, therefore, that Canyon Country was not entitled to 'reasonable' fees, but [to fees calculated based on its contingency fee arrangement]").

[130] *See Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985) (explaining that consequential damages are damages "reasonably within the contemplation of, or reasonably foreseeable by, the parties at the time the contract was made").

[131] 2001 UT 89, ¶¶ 118–25.

[132] 918 P.2d at 468. A third case, *Canyon Country Store v. Bracey*, addressed an award of attorney fees based on a contingency fee to hold that a party may not be awarded more attorney fees than "the same amount it was legally obligated to pay counsel." 781 P.2d at 420.

consequential damages.[133] As such, we held that the awards must be foreseeable. We noted that there were two elements to foreseeability when dealing with an award based on a contingency fee. First, as is usual in other fees *qua* damages cases,[134] we required evidence showing that it was foreseeable that the insured party would incur attorney fees if the insurer breached.[135] The second element, unique to cases where the fee sought is based solely on a contingency fee arrangement, required proof that the specific contingency fee arrangement entered into by the insured party was foreseeable.[136] In both cases, we addressed each of these requirements and found them to both be satisfied.[137] Accordingly, because the attorney fees were sought as consequential damages, and both the incurring of fees and the contingency fee arrangements themselves were foreseeable, we approved the purely contingency fee-based awards of attorney fees.[138] This two-part foreseeability requirement applicable to

---

[133] *Campbell*, 2001 UT 89, ¶¶ 120–21; *Billings*, 918 P.2d at 468. The attorney fee award in *Canyon Country* was likewise obtained as consequential damages. 781 P.2d at 420.

[134] *See Pac. Coast Title Ins. v. Hartford Accident & Indem. Co.*, 325 P.2d 906, 908 (Utah 1958); *Heslop*, 839 P.2d at 840–41.

[135] *Campbell*, 2001 UT 89, ¶ 123 ("Thus, the issue becomes whether, at the time State Farm issued the policy to the Campbells, State Farm could reasonably foresee that if a claim arose against it the Campbells would incur attorney fees in pursuing that claim."); *Billings*, 918 P.2d at 468 (noting the district court had found that "it was foreseeable at the time the parties entered into the insurance contract that Billings would incur attorney fees if Union Bankers breached").

[136] *Campbell*, 2001 UT 89, ¶ 124 ("In other words, could State Farm reasonably foresee that the Campbells would agree to a contingency attorney fee of 40% . . . ?"); *Billings*, 918 P.2d at 468 ("Billings now argues that the district court's finding that Billings' contingency fee arrangement was not foreseeable was not supported by the evidence.").

[137] *Campbell*, 2001 UT 89, ¶¶ 123, 125; *Billings*, 918 P.2d at 468.

[138] We note that not every case seeking attorney fees as consequential damages will seek a fee award based on a contingency fee arrangement. In these circumstances, the foreseeability requirement is satisfied if the opposing party could foresee that the

(Continued)

contingency fees sought as consequential damages has been referred to as the *Campbell* rule.[139]

¶ 95   USA Power points to two cases from our court of appeals, *Kealamakia, Inc. v. Kealamakia*[140] and *Staffing America v. Advanced Management Concepts, Inc.*,[141] as contrary to the principles just discussed.[142] Neither case supports USA Power's argument that a contingency fee may serve as the sole basis of an award when the fees are not sought as damages, however, because in neither case was the issue before the court. In *Kealamakia*, the court of appeals stated that the trial court had not "simply used the contingency fee arrangement without evaluating the reasonableness for that amount."[143] Indeed, the court stated that the trial court had specifically found the fee amount to be reasonable and found that the record contained evidence supporting the trial court's determination under the traditional reasonableness analysis.[144] And

---

party would need to incur legal fees to rectify whatever wrong has occurred. *See Pacific Coast Title*, 325 P.2d at 908; *Heslop*, 839 P.2d at 840–41. There is no need to conduct a separate analysis of whether the amount of the award was foreseeable unless the party being awarded fees seeks more than the usual "reasonable" attorney fee.

[139] *See Staffing Am., Inc. v. Advanced Mgmt. Concepts, Inc.*, 2005 UT App 437, para. 7 n.3 (unpublished opinion).

[140] 2009 UT App 148, ¶¶ 5–14.

[141] 2005 UT App 437, paras. 5–8 (unpublished opinion).

[142] Both cases permitted an award of attorney fees in reliance on our acknowledgement in *Campbell* that "breach of a fiduciary obligation is a well-established exception to the American rule precluding attorney fees in tort cases generally." *Campbell*, 2001 UT 89, ¶ 122. We have not stated whether this exception to the American Rule requires attorney fees to be sought as damages or if it permits a party to seek a separate award. *Kealamakia* and *Staffing America* suggest that our court of appeals has employed both methods. *Compare Kealamakia*, 2009 UT App 148, ¶ 8 (attorney fees obtained "in the form of a separate award") *with Staffing Am.*, 2005 UT App 437, para. 7 (attorney fees awarded "as a component of foreseeable damages"). This issue is not before us today, though we note that *Campbell* suggests that attorney fees in breach of fiduciary actions should be sought as damages. *See Neff*, 2011 UT 6, ¶ 88.

[143] 2009 UT App 148, ¶ 9.

[144] *Id.*

in *Staffing America*, an unpublished case, the fees were awarded "as a component of *foreseeable damages*," and the paying party had "inadequately briefed any argument that [the] case somehow [fell] outside of the *Campbell* rule" discussed above.[145] Thus, neither case conflicts with the rule we clarify today.[146] We accordingly hold, based on our precedent, that a trial court may award attorney fees based solely on a contingency fee arrangement only when the award is sought as damages[147] and the contingency fee arrangement was foreseeable.

¶ 96    We emphasize, however, that a contingency fee agreement is not irrelevant to the determination of what constitutes a reasonable attorney fee in cases where the fee award is not sought as damages. Indeed, the rubric we have provided to calculate a reasonable fee award under the lodestar method requires a trial court to determine whether there are "circumstances which require consideration of additional factors, including those listed in the [Rules of Professional Conduct],"[148] such as "whether the fee is fixed or contingent."[149] Further, we have expressly recognized that the lodestar method permits a court to apply a "multiplier" to increase or decrease the total award in order to account for a number of factors, such as "the contingent nature of the case, . . . the risks assumed, and . . . the delay in payment."[150] Accordingly, it may have been appropriate for the trial court in this case to adjust the lodestar-based award in light of USA Power's contingency fee arrangement. The record is not clear as to whether the trial court made such an adjustment, however, because the parties stipulated to the amount of the attorney fees.[151] Although USA Power suggests that the trial

---

[145] 2005 UT App 437, para. 7 & n.3 (unpublished opinion) (emphasis added).

[146] To the extent that the cases contain language suggesting that a different rule would apply, such language is disaffirmed.

[147] We express no opinion today on the types of cases that permit parties to seek attorney fees as damages.

[148] *Dixie State Bank*, 764 P.2d at 990.

[149] UTAH R. PROF. CONDUCT 1.5(a)(8).

[150] *Barker*, 970 P.2d at 708–09.

[151] The trial court's order granting attorney fees was based on the stipulation of both USA Power and PacifiCorp and awarded USA

(Continued)

court failed to appropriately adjust the award, this argument has been inadequately briefed, is unpreserved,[152] and we do not address it further.

¶ 97    USA Power's final argument as to why its contingency fee arrangement should serve as the basis for the award of attorney fees is that an increased award would ensure that USA Power was made whole—i.e., it would not have to pay its attorneys out of the amount awarded by the jury.[153] As we have repeatedly stated, however, the contracted billing rate of a party's attorney is not determinative of a fee award.[154] As such, there will likely often be cases where a party must pay its attorney more than the amount of reasonable attorney fees it was awarded. This case highlights the dangers of awarding fees based on the contract between the prevailing party and their counsel and emphasizes the importance of ensuring that a fee award does not "punish the losing party by allowing the winner a windfall

---

Power "$2,000,000 . . . based on the reasonable number of hours spent by Plaintiffs' counsel on the trade secrets misappropriation claim against PacifiCorp multiplied by a reasonable hourly rate (i.e., lodestar method *including possible multiplier*)."

[152] Although USA Power argues that its stipulation to the amount of attorney fees did not waive its right to argue that the trial court should have considered the contingency fee agreement in awarding attorney fees, the only place in the record it points us to is an argument made prior to the stipulation of the amount of attorney fees, where USA Power claimed that PacifiCorp's originally proposed award did not adequately take the contingency fee arrangement into consideration. There is no indication, however, that USA Power objected to the determination of the hourly rate or the trial court's alleged failure to properly include a multiplier in connection with the stipulated order. Thus, because the trial court had no opportunity to rule on the issue, the issue is unpreserved. *See Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828.

[153] *See Softsolutions*, 2000 UT 46, ¶ 51 ("[T]he basic purpose of attorney fees is to indemnify the prevailing party . . . .").

[154] *See Dixie State Bank*, 764 P.2d at 990 ("It is important to note that with this [reasonableness] analysis, what an attorney bills or the number of hours spent on a case is not determinative."); *Cabrera v. Cottrell*, 694 P.2d 622, 624 (Utah 1985) ("Reasonable attorneys fees are not measured by what an attorney actually bills, nor is the number of hours spent on the case determinative in computing fees.").

profit."[155] USA Power's total award, not including the attorney fee award, was $112,510,000, though only $21,399,391 was for actual damages.[156] The rest, $91,110,609, was an award against PacifiCorp for unjust enrichment. Although USA Power may be obligated to pay its attorneys out of the unjust enrichment damages, such damages "do[] not aim to compensate the victims of the wrongful acts, as restitution does."[157] Instead, they are "meant to prevent the wrongdoer from enriching himself by his wrongs."[158] As no part of the unjust enrichment award compensates USA Power for its actual losses, ensuring that USA Power can retain the full unjust enrichment award by requiring PacifiCorp to pay more than a reasonable attorney fee would do nothing to make USA Power whole. Instead, it would only punish PacifiCorp, a result antithetical to the purpose of a fee award.[159]

¶ 98    Because USA Power did not seek attorney fees as damages and did not prove that its contingency fee arrangement was foreseeable, its contingency fee cannot serve as the sole basis for its fee award. We accordingly affirm the trial court's determination of the amount of fees pursuant to the lodestar method.

---

[155] *Softsolutions,* 2000 UT 46, ¶ 51.

[156] USA Power was also awarded costs and fees totaling $2,322,468.11.

[157] *S.E.C. v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993).

[158] *Id.*

[159] USA Power's argument that "the unique circumstances" present in this case of willful and malicious misappropriation justify an increased fee award only serves to further highlight that an increased fee award would be purely punitive in nature. USA Power's argument ignores that attorney fees can only be awarded in trade secret cases where there has been willful and malicious misappropriation, meaning every case where fees are awarded will involve willful and malicious misappropriation—hardly a unique set of circumstances. And USA Power's argument improperly suggests that a party's misconduct should justify higher fee awards, impermissibly turning an award of attorney fees into exemplary or punitive damages.

### IV. USA Power Is Not Entitled to Prejudgment Interest

¶ 99    Next, USA Power claims that the trial court erred in denying any form of prejudgment interest. USA Power argues first that it was entitled to prejudgment interest beginning at some point prior to the verdict.[160] It also argues in the alternative that, even if it is not awarded prejudgment interest prior to the verdict, it was entitled to post-verdict, prejudgment interest under rule 54(e) of the Utah Rules of Civil Procedure and under the common law. We address these issues in turn and affirm the trial court's denial of any form of prejudgment interest.

### A. USA Power Is Not Entitled to General Prejudgment Interest

¶ 100 "Prejudgment interest may be recovered where the damage is complete, . . . 'the loss ha[s] been fixed as of a definite time and the amount of the loss can be calculated with mathematical accuracy in accordance with well-established rules of damages.'"[161] "[L]osses that cannot be calculated with mathematical accuracy are those in which damage amounts are to be determined by the broad discretion of the trier of fact,"[162] requiring the fact-finder to "be guided by their best judgment in assessing the amount to be allowed for past as well as for future injury."[163] Such losses include those stemming from personal injury, wrongful death, defamation, false imprisonment, malicious prosecution, and assault and battery.[164] Although not per se excluded, we are generally "reluctan[t] to award prejudgment interest for unrealized profits."[165] This is so because "[d]amages in [lost profit] cases do not represent an actual, ascertainable loss; they represent the fact[-]finder's best

---

[160] USA Power fails to specify when the prejudgment interest should begin. Indeed, the whole sum of its argument in its opening brief is a paraphrased quote from *Encon Utah, LLC v. Fluor Ames Kreamer, LLC*, 2009 UT 7, ¶ 51, 210 P.3d 263. Although this is clearly inadequate briefing, we address the issue briefly to clarify the application of prejudgment interest in lost profit cases.

[161] *Id.* ¶ 51 (second alteration in original) (citations omitted).

[162] *Id.* ¶ 53 (emphasis omitted) (citation omitted).

[163] *Fell v. Union Pac. Ry. Co.*, 88 P. 1003, 1007 (Utah 1907).

[164] *Id.* at 1006.

[165] *Encon*, 2009 UT 7, ¶ 59 (citation omitted).

approximation of that loss."[166] "[T]he very nature of lost future profits injects an air of uncertainty and speculation into the calculation of damages."[167]

¶ 101 USA Power argues that the calculation of damages resulting from the failed RFP bid was sufficiently certain to allow for prejudgment interest under the standard just discussed. Its explanation for why it has satisfied this standard is telling, however: "USA Power's actual losses and unjust enrichment damages were not general tort damages, were the subject of admissible expert and lay testimony, and involved facts and figures based on fixed rules of evidence and known standards of value."[168] If this were the standard, nearly every claim would receive prejudgment interest. The evidence USA Power points to as establishing the "mathematical accuracy" of its loss shows that USA Power estimated its lost profits to be somewhere between $3 million and $24.09 million, requiring the jury to use its best judgment in estimating what sequence of events would have unfolded and the value of the contracts that USA Power might have entered into. The project "was not an established business with a long-term history of profits,"[169] there was no contract specifying the amount of profit USA Power would have gotten if PacifiCorp had not breached,[170] and it is uncertain whether USA

---

[166] *ClearOne Commc'ns, Inc. v. Chiang*, 432 F. App'x 770, 774 (10th Cir. 2011); *see also Penelko, Inc. v. John Price Assocs., Inc.*, 642 P.2d 1229, 1233 (Utah 1982) ("To recover damages for lost profits, the evidence submitted must provide the jury with a sufficient basis for *estimating damages* with reasonable certainty." (emphasis added)).

[167] *Anesthesiologists Assocs. of Ogden v. St. Benedict's Hosp.*, 852 P.2d 1030, 1042 (Utah Ct. App. 1993), *vacated on other grounds*, 884 P.2d 1236 (Utah 1994).

[168] Although USA Power attempts to argue it was entitled to prejudgment interest on both the actual loss—lost profits—and the unjust enrichment awards, it fails to provide any meaningful analysis of prejudgment interest in the context of an unjust enrichment award. Accordingly, we decline to address the issue.

[169] *Cf. Canyon Country Store v. Bracey*, 781 P.2d 414, 422 (Utah 1989).

[170] *Cf. Encon*, 2009 UT 7, ¶¶ 59–61 (permitting prejudgment interest on lost profits based on "a completed percentage of work on

(Continued)

Power would have actually obtained each of the contracts—with the requisite specified terms—that it needed to obtain a profit of $21,399,391—the ultimate award.

¶ 102 USA Power essentially argues that because its "claims c[ould] be reduced eventually to monetary value," it should receive prejudgment interest.[171] We have long rejected this proposition.[172] Although USA Power was entitled to put on "the best evidence available" in support of its claim for lost profits,[173] our requirement that "the amount of the loss . . . be calculated with mathematical accuracy in accordance with well-established rules of damages"[174] means that evidence that is sufficient to permit a jury to consider whether to award damages for lost profits may still be insufficient to justify an award of prejudgment interest.[175] As the Tenth Circuit stated, "[t]here is a difference between a loss that can be 'measured by facts and figures,' and using facts and figures to estimate a loss."[176] Accordingly, due to the amount of uncertainty inherent in USA Power's award for lost profits, we affirm the trial court's denial of USA Power's request for prejudgment interest.

*B. USA Power Is Not Entitled to Post-Verdict Prejudgment Interest*

¶ 103 USA Power argues that even if it is not entitled to full prejudgment interest, it is entitled to prejudgment, post-verdict interest and asserts that rule 54(e) of the Utah Rules of Civil

---

a fixed-price contract," where the parties had agreed that a 10% profit margin was reasonable).

[171] *Canyon Country*, 781 P.2d at 422.

[172] *See id.* ("It is, of course, axiomatic that all claims can be reduced eventually to monetary value. All claims would therefore at some point become liquidated and theoretically subject to prejudgment interest claims. Common sense precludes such an interpretation, however.").

[173] *Penelko*, 642 P.2d at 1233 .

[174] *Encon*, 2009 UT 7, ¶ 51.

[175] *See Canyon Country*, 781 P.2d at 422 ("While the basis of the 'formula' used to determine Canyon Country's lost profits may have been sufficient for the jury to render a verdict in favor of Canyon Country, it is too speculative to allow for the addition of prejudgment interest.").

[176] *ClearOne*, 432 F. App'x at 775 (citation omitted).

Procedure provided a basis for this claim.[177] The rule stated that "[t]he clerk must include in any judgment signed by him any interest on the verdict or decision from the time it was rendered, and the costs, if the same have been taxed or ascertained." USA Power argues that this rule conferred an automatic right to pre-judgment, post-verdict interest. Although "the rule [was] no model of clarity," the text of the rule suggests that only interest that has been "taxed or ascertained" should be added to the verdict.[178]

¶ 104 This reading of the rule is supported by cases discussing prejudgment interest, which USA Power fails to address. For example, we have held that "'[p]rejudgment interest' represents an amount *awarded as damages* due to the opposing party's delay in tendering the amount owing under an obligation."[179] USA Power's interpretation of the rule would permit a clerk to add prejudgment interest as a matter of course, not as an award stemming from any delay of an overdue payment.[180] Cases from our court of appeals and our own rules of appellate procedure further undermine USA Power's claim.[181] Because USA Power failed to provide any

---

[177] Rule 54(e) was removed from the rules of procedure in 2011.

[178] *See Russo v. Ballard Med. Prods.*, 550 F.3d 1004, 1023 (10th Cir. 2008) (discussing how relevant cases and rule 32 of the Utah Rules of Appellate Procedure, which adds to an affirmed judgment "whatever interest is allowed by law . . . from *the date the judgment was entered* [in the trial court]," suggest that post-verdict, pre-judgment interest is not permitted under rule 54(e) (emphasis added) (citation omitted)). To paraphrase the Tenth Circuit's statement addressing this exact claim, "[t]he difficulty with [USA Power's] reading of the Rule . . . is that, if it were correct, post-verdict, pre-judgment interest would be an everyday matter in Utah. Yet, [USA Power] cites to us not a single Utah case adopting [its] view of Rule 54(e)." *Id.*

[179] *L & A Drywall, Inc. v. Whitmore Constr. Co.*, 608 P.2d 626, 629 (Utah 1980) (emphasis added).

[180] As discussed below, a judgment is necessary to render due a debt created by a successful lawsuit.

[181] *See Mason v. W. Mortg. Loan Corp.*, 754 P.2d 984, 986–87 (Utah Ct. App. 1988) (holding "that when a judgment is reversed on appeal, the new judgment subsequently entered by the trial court may bear interest only from the date of entry of that new judgment,"

(Continued)

justification for adopting its interpretation of rule 54(e), we affirm the trial court's denial of post-verdict, prejudgment interest.[182]

¶ 105  USA Power also argues that it is entitled to prejudgment, post-verdict interest under the common law because the verdict liquidated the amount owed. The cases USA Power cites for this argument affirm the "'well[-]established rule' of this jurisdiction that allows interest on overdue debts."[183] The question becomes when PacifiCorp's liability to USA Power, as established by the jury's verdict, became due. USA Power has provided no argument as to this point other than conclusory statements and no legal authority other than cases stating the common law rule permitting interest on overdue debts. Aside from being inadequately briefed, USA Power's argument fails to address our court of appeals' reasoning in *Bailey-Allen Co. v. Kurzet*,[184] where the court cited two cases for the proposition that the "entry of judgment and not oral ruling liquidates damages."[185] This is so because any order "may be

---

as this approach was "in line with" rule 54(e)); Utah R. App. P. 32 (adding to an affirmed judgment "whatever interest is allowed by law . . . from *the date the judgment was entered in the trial court*" (emphasis added)).

[182] We also note that because subsection (e) of rule 54 has been eliminated completely by a recent amendment—and because USA Power failed to adequately brief the issue—we see no need to further discuss whether USA Power's interpretation should be adopted.

[183] *Bds. of Educ. of the Granite, Murray City, Jordan, & Salt Lake City Sch. Dists. v. Salt Lake Cty. Comm'n*, 749 P.2d 1264, 1267 (Utah 1988) (citation omitted); *see also Vali Convalescent & Care Insts. v. Div. of Health Care Fin.*, 797 P.2d 438, 445 (Utah Ct. App. 1990) ("The law in Utah, including where the debt is owed by a governmental entity, is to allow 'interest on overdue debts even where no statute so provides.'" (citation omitted)).

[184] 876 P.2d 421, 427 & n.4 (Utah Ct. App. 1994) (citing *Nat'l Steel Constr. Co. v. Nat'l Union Fire Ins.*, 543 P.2d 642, 644–45 (Wash. Ct. App. 1975); *Pure Gas & Chem. Co. v. Cook,* 526 P.2d 986, 993 (Wyo. 1974)).

[185] *Id.* at 427 n.4 (describing *Nat'l Steel Constr. Co.*, 543 P.2d at 644–45). USA Power also failed to address the cases cited by PacifiCorp in its briefing. *See, e.g., Kiessling v. Nw. Greyhound Lines, Inc.*, 229 P.2d 335, 340 (Wash. 1951) (stating that the "verdict of a jury or a pronouncement by the court determines and fixes a definite amount

(Continued)

changed at any time before the entry of judgment."[186] Accordingly, we affirm the trial court's denial of common law interest. Having affirmed the trial court's decision to not award any prejudgment interest, we turn now to the final issue in USA Power's cross-appeal.

### V. USA Power Is Not Entitled to the Ten Percent Interest Rate Under Section 15-1-1

¶ 106  The final issue in USA Power's cross-appeal is whether it was entitled to the ten percent interest rate provided for in section 15-1-1 of the Utah Code.[187] Section 15-1-1 permits parties to agree on any interest rate in a contract and provides that, if no interest rate is agreed upon, a ten percent interest rate applies.[188] USA Power argues that because the contract entered into by the parties did not provide for an interest rate, the interest rate found in the statute should apply. The question, then, is whether the contract between USA Power and PacifiCorp falls within the categories of contracts that receive the ten percent interest rate provided by the statute. Section 15-1-1(2) states that "the legal rate of interest for the loan or forbearance of any money, goods, or chose in action shall be 10% per annum." USA Power argues that the statute permits any "chose in action"[189] based on a contract to receive the ten percent interest rate,

---

of recovery, but the demand is not fully liquidated until the entry of judgment").

[186] UTAH R. CIV. P. 54(b).

[187] It appears that USA Power has argued that it is entitled to this interest rate for both prejudgment and post-judgment interest. Because we have affirmed the trial court's denial of prejudgment interest, we address this issue only in terms of USA Power's entitlement to post-judgment interest, though our interpretation of the statute is equally applicable to a request for prejudgment interest.

[188] *See* UTAH CODE § 15-1-1(1) ("The parties to a lawful contract may agree upon any rate of interest . . . ."); *id.* § 15-1-1(2) ("Unless parties to a lawful contract specify a different rate of interest, the legal rate of interest . . . shall be 10% per annum.").

[189] A "chose in action" is defined as "a claim or debt upon which a recovery may be made in a lawsuit." *Snow, Nuffer, Engstrom & Drake v. Tanasse*, 1999 UT 49, ¶ 9, 980 P.2d 208 (citation omitted). Essentially, the phrase is another way of describing a right to sue or cause of action. *Id.*

citing cases that have interpreted section 15-1-1 in that manner. PacifiCorp argues that such an interpretation is contrary to the plain language of the statute and asks us to clarify its meaning.

¶ 107 We recognize that we have suggested in prior cases that section 15-1-1 applies to all cases involving a contract. This interpretation has been proffered, however, either in dicta[190] or without any analysis of the potentially limiting "loan or forbearance" language in the statute.[191] Further, we have on at least two occasions expressed concern with the apparent acceptance of this interpretation of the statute. In *Consolidation Coal Co. v. Utah Division of State Lands and Forestry*,[192] Chief Justice Zimmerman added a footnote expressing "serious reservations about the initial

---

[190] *See, e.g.*, *Utah Res. Int'l, Inc. v. Mark Techs. Corp.*, 2014 UT 60, ¶ 19 & n.14, 342 P.3d 779 (noting that "the applicable interest rate was set by statute at ten percent, compounded annually," in a discussion of whether a trial court could reduce the amount of security required to be deposited during an appeal); *Whitney v. Faulkner*, 2004 UT 52, ¶ 17, 95 P.3d 270 (stating that "[s]ection 15-1-1 of the Utah Code provides that . . . the absence of a contractually defined rate will result in imposition of the statutory rate of ten percent," though not applying the statute because the parties did not have a contract); *Nielsen v. O'Reilly*, 848 P.2d 664, 669–70 (Utah 1992) (stating that "[s]ection 15-1-1[] establishes the legal rate of prejudgment interest in a breach of contract as 10 percent per annum" but refusing to "address the issue of whether an insurer who breaches a contract . . . is liable for prejudgment interest" because the plaintiff "failed to pursue a claim for breach of contract"), *superseded by statute*; *Lignell v. Berg*, 593 P.2d 800, 809 (Utah 1979) (describing the interest rate as set by section 15-1-1, but not interpreting the statute because the only argument was "about the due date used by the court in its computation" of interest).

[191] *See, e.g.*, *Young v. Young*, 1999 UT 38, ¶ 36, 979 P.2d 338 (quoting the statute and applying the interest rate provided therein to a breach of lease without discussing the limiting language); *SCM Land Co. v. Watkins & Faber*, 732 P.2d 105, 109 (Utah 1986) (same); *Piacitelli v. S. Utah State Coll.*, 636 P.2d 1063, 1069 (Utah 1981) (describing the appropriate measure of damages for an employee dismissed without compliance with an employment contract and stating simply that "[t]he employee is also entitled to interest at the statutory rate as specified in [section] 15-1-1").

[192] 886 P.2d 514 (Utah 1994).

correctness and therefore the continued vitality" of cases "purport[ing] to tie prejudgment interest rates in all contract cases to the section 15-1-1 rate," noting that those cases failed to "discuss[] the limiting language of that section."[193] He suggested that "[t]he plain language of section 15-1-1 seems to indicate that the section was intended to apply only to a 'loan or forbearance' of 'money, goods or chose in action.'"[194] We later echoed these concerns in *Wilcox v. Anchor Wate, Co.*,[195] suggesting that "the default rate specified in section 15-1-1(2) does not automatically extend to all judgments obtained in contract cases."[196] In neither of these cases, however, was the issue necessary to our decision.[197]

¶ 108 In this case, the question of the scope of section 15-1-1 is squarely presented and our resolution of this question is necessary to our decision. The statute states that it applies to contracts "for the loan or forbearance of any money, goods, or chose in action."[198] Because "[w]e presume that the legislature used each word advisedly" and "that the expression of one [term] should be interpreted as the exclusion of another,"[199] the description of certain kinds of contracts in the statute necessarily limits the statute's application to only those contracts described therein: contracts for the "loan . . . of any money [or] goods" or for the "forbearance of any . . . chose in action." Because we cannot ignore the plain language of the statute, we must reject USA Power's

---

[193] *Id.* at 524 n.13 (Utah 1994), *abrogated on other grounds by State ex rel. Sch. & Inst. Trust Land Admin. v. Mathis*, 2009 UT 85, 223 P.3d 1119.

[194] *Id.* (citation omitted).

[195] 2007 UT 39, 164 P.3d 353.

[196] *Id.* ¶ 46.

[197] *See Consolidation Coal*, 886 P.2d at 524 n.13 ("Nevertheless, because the state has failed to raise this issue and its resolution is not necessary for a disposition of this case, we decline to address it."); *Wilcox*, 2007 UT 39, ¶ 46 (stating that section 15-1-1 did not apply to the case and applying another statutory prejudgment interest rate).

[198] UTAH CODE § 15-1-1(2).

[199] *Penunuri v. Sundance Partners, Ltd.*, 2013 UT 22, ¶ 15, 301 P.3d 984 (citation omitted) (second alteration in original).

interpretation.[200] In so doing, we disavow any prior statements suggesting the statute provides a default interest rate applicable in any breach of contract case.

¶ 109 We accordingly hold that the statute applies only to contracts "for the loan or forbearance of any money, goods, or chose in action." As the contract in this case was not one of the contracts described in section 15-1-1, the interest rate provided therein does not apply. Instead, section 15-1-4 provides the appropriate interest rate: "the federal postjudgment interest rate as of January 1 of each year, plus 2%."[201] We thus affirm the trial court's decision to not apply the interest rate found in section 15-1-1.

¶ 110 For the reasons discussed above, we affirm the trial court as to each issue addressed by USA Power in its cross-appeal. We turn now to the third appeal in this case, USA Power's direct appeal of the trial court's grant of JNOV in favor of Ms. Williams.

## USA Power's Direct Appeal

¶ 111 After the jury found that Ms. Williams damaged USA Power by breaching her fiduciary duties, Ms. Williams moved for JNOV. The trial court granted the motion, finding for several reasons that no competent evidence supported USA Power's causation argument—i.e., that USA Power had failed to connect Ms. Williams's actions to its damages. USA Power appeals this ruling, arguing that there was sufficient evidence from which a reasonable jury could find that Ms. Williams caused PacifiCorp to select its own bid rather than USA Power's. USA Power alternatively argues that, even if there is no evidence that Ms. Williams caused USA Power to lose the RFP, there was sufficient evidence to prove that she caused PacifiCorp to break off negotiations and abandon a contract for the purchase of USA Power's Spring Canyon proposal. We address each of USA Power's theories in turn and affirm the trial court's grant of JNOV.

---

[200] *Turner v. Staker & Parson Cos.*, 2012 UT 30, ¶ 12, 284 P.3d 600 ("Wherever possible, we give effect to every word of a statute, avoiding '[a]ny interpretation which renders parts or words in a statute inoperative or superfluous.'" (alteration in original) (citation omitted)).

[201] Utah Code § 15-1-4(3)(a).

## I. USA Power Has Not Shown that It Would Have Benefitted by Winning the RFP Absent Ms. Williams's Conduct

¶ 112 USA Power's central argument on appeal is that it presented sufficient evidence to support the jury's finding that Ms. Williams damaged USA Power by helping PacifiCorp obtain water rights that were critical to PacifiCorp's proposal winning out over USA Power's. Before addressing the issues related to the evidence, however, we first address the parties' arguments regarding the appropriate causation analysis in legal malpractice cases. The parties argue over what USA Power's burden was and whether it was required to show that "no other lawyer" could have obtained the same results. Ms. Williams also contends that expert testimony is necessary to prove causation under her proposed standard—testimony that USA Power did not provide. We first address the parties' arguments over the standard of causation applicable in legal malpractice suits. We then address whether USA Power presented sufficient evidence to support its theory of causation under this standard. Ultimately, we affirm the trial court's grant of JNOV, holding that USA Power failed to present sufficient evidence in support of its claim.

### A. Clients in Legal Malpractice Cases Must Show that Absent the Attorney's Conduct, They Would Have Benefitted

¶ 113 Although there are different causes of action that a client can assert against its attorney, each action includes the element of causation. And "the same standard of causation applies whether the alleged wrong is a negligent act, a fiduciary breach, or even a contractual breach."[202] Because this causation requirement is a crucial and distinct element to any malpractice claim, an abundance of evidence as to breach of duty cannot make up for a deficiency of evidence as to causation.[203] The question before us today is what must be shown to satisfy this element.

---

[202] *Christensen & Jensen, P.C. v. Barret & Daines*, 2008 UT 64, ¶ 25, 194 P.3d 931 (citation omitted).

[203] *See Alexander v. Turtur & Assocs.*, 146 S.W.3d 113, 119 (Tex. 2004) ("Breach of the standard of care and causation are separate inquiries, . . . an abundance of evidence as to one cannot substitute for a deficiency of evidence as to the other."); *accord Williams v. Barber*, 765 P.2d 887, 889 (Utah 1988) ("When an attorney breaches such duty, he is liable for all damages directly and proximately

(Continued)

¶ 114 Although the causation element of a legal malpractice claim has sometimes been defined as two separate inquiries—actual or "but for" causation[204] and proximate or legal causation[205]— it can be difficult in practice to separate an actual cause analysis from a proximate cause analysis as both require a counterfactual analysis. In other words, both require us to inquire as to "what would have occurred if the [attorney] had not engaged in the . . . conduct."[206] The reason for this is that proximate causation is not truly a separate

caused by his act or failure to act. Generally speaking, incurring liability through a breach of duty does not necessarily result in damages." (citation omitted)). For this reason, in making a causation assessment we disregard evidence that goes only to whether or not Ms. Williams breached her fiduciary duties, including evidence that Ms. Williams had acquired confidential information while working for USA Power, that she shared that information with PacifiCorp, and that both PacifiCorp and Ms. Williams were aware of a potential conflict of interest.

[204] In the legal malpractice context, actual or "but for" cause requires the client to prove that "but for the attorney's wrong[,] [the client's] loss would not have occurred." *Kilpatrick v. Wiley, Rein & Fielding*, 909 P.2d 1283, 1291 (Utah Ct. App. 1996).

[205] Proximate or legal cause in legal malpractice cases looks to whether the attorney's conduct "is the efficient cause—the one that necessarily sets in operation the factors that accomplish the injury." *Harline v. Barker*, 912 P.2d 433, 439 (Utah 1996) (citation omitted). There are several aspects to a proximate cause analysis, including whether the harm was foreseeable, whether there was an intervening cause, and whether the harm would have occurred regardless of the actor's wrongful act. *See Steffensen v. Smith's Mgmt. Corp.*, 862 P.2d 1342, 1346 (Utah 1993); *Kilpatrick*, 909 P.2d at 1293; *Proctor v. Costco Wholesale Corp.*, 2013 UT App 226, ¶ 11, 311 P.3d 564; *Harline*, 912 P.2d at 439 ("To prove proximate cause in legal malpractice cases . . . , the plaintiff must show that absent the attorney's negligence, the underlying suit would have been successful."). Because of this last factor, which is usually determinative of the causation theory, the proximate cause analysis in legal malpractice cases has sometimes been defined as simply an analysis of whether "a reasonable likelihood exists that [the client] would have ultimately benefitted." *Kilpatrick*, 909 P.2d at 1291.

[206] RESTATEMENT (THIRD) OF TORTS: LIAB. FOR PHYSICAL & EMOTIONAL HARM § 26 cmt. e (AM. LAW INST. 2010).

causation analysis, but it is rather an analysis of whether the causation that exists is sufficient to warrant liability.[207] Ultimately, a proximate cause analysis looks to whether an individual who is a but-for cause of the harm should nevertheless be excused from liability.

¶ 115 Because of the interrelatedness of these two causation analyses, we have "distilled the standard for causation in legal malpractice actions"[208] to the following framework: "the client is required to show that absent the conduct complained of[,] . . . the client would have benefitted."[209] Causation requires us to "inquire as to what the [client's] position would have been [if the attorney had acted differently], as compared to [the client's] present position."[210] If the client's injury would have occurred regardless of the attorney's action, then there is no causation. This means that the client must prove not only that its attorney caused the client to lose the chance to litigate a case or negotiate certain terms in a business deal, but also that the client would have won the case if it was litigated[211] or that

---

[207] *See Proctor*, 2013 UT App 226, ¶¶ 10–11 ("In other words, '[p]roximate cause refers to the basic requirement that before recovery is allowed in tort, there must be some direct relation between the injury asserted and the injurious conduct alleged,' i.e., 'it limits liability at some point before the want of a nail leads to the loss of the kingdom.'" (citation omitted) (alteration in original)); *Raab v. Utah Ry. Co.*, 2009 UT 61, ¶ 23, 221 P.3d 219 ("For a particular negligent act to be the legal cause of a plaintiff's injuries, there must be some greater level of connection between the act and the injury than mere 'but for' causation."); *see also* RESTATEMENT (THIRD) OF TORTS: LIAB. FOR PHYSICAL AND EMOTIONAL HARM § 29 (AM. LAW INST. 2010).

[208] *Kilpatrick*, 909 P.2d at 1291.

[209] *Christensen & Jensen*, 2008 UT 64, ¶ 26.

[210] *Dunn v. McKay, Burton, McMurray & Thurman*, 584 P.2d 894, 895 (Utah 1978); *see also Williams*, 765 P.2d at 889 ("[P]roximate cause embraces an assessment of the merits of the underlying cause of action.").

[211] *See Harline*, 912 P.2d at 439 ("To prove proximate cause in legal malpractice cases . . . , the plaintiff must show that absent the attorney's negligence, the underlying suit would have been successful."); *Williams*, 765 P.2d at 890 (holding that the client had

(Continued)

the other parties to the deal would have accepted the client's desired terms.[212] Although the parties discuss various ways both we and our court of appeals have articulated and applied this standard, in each case we were focusing on the same basic concept: a plaintiff, to prove the element of causation in a legal malpractice suit, must show that he or she would have been better off if the attorney's alleged malpractice had never occurred.

¶ 116 Although the parties generally agree as to this standard, they disagree as to whether it encompasses a requirement that USA Power demonstrate that a different attorney, with reasonable skill and diligence, would not have been able to duplicate Ms. Williams's work for PacifiCorp. But this "no other lawyer" requirement is simply the application of the "would have benefitted" standard discussed above to certain kinds of breach of fiduciary duty claims—such as the ones asserted by USA Power here. Where a client has asserted that its attorney breached the duties of loyalty or confidentiality by working for or sharing information with a third party—whether an opposing party in litigation or business—and that the breach ultimately disadvantaged the client in some way, the client still has the burden of showing that absent that attorney's breach, it would have benefitted. And if the third party or attorney provides evidence that the third party would have hired a different attorney in the stead of the breaching attorney, the client must accordingly show that this other attorney, with reasonable skill and diligence, would not have been able to do for the third party what

the burden of proof of establishing both that he would have had a meritorious defense to the underlying case and that there was a reasonable likelihood that he could have prevailed in order to hold his attorney liable for damages for failing to respond to a summary judgment motion).

[212] *See Christensen & Jensen*, 2008 UT 64, ¶ 35 (stating that a client's attorneys could not be held liable for the loss of a settlement from State Farm because there was no possibility of negotiating a settlement as the client desired); George S. Mahaffey Jr., *Cause-in-Fact and the Plaintiff's Burden of Proof with Regard to Causation and Damages in Transactional Legal Malpractice Matters: The Necessity of Demonstrating the Better Deal*, 37 Suffolk U. L. Rev. 393, 436–37 (2004) ("[T]he plaintiff will have to demonstrate that the non-party in the underlying deal or transaction would have given the plaintiff a better deal or a better set of terms, for example.").

the breaching attorney did.[213] As the Colorado Court of Appeals stated, there can be no causation where the "attorney's conduct did not cause [the client] any pecuniary loss or damage [the client] would not have also suffered had another attorney represented [the other party]."[214]

¶ 117 USA Power's only response to this conclusion is that we rejected it in *USA Power I*. In fact, however, we did just the opposite in that case. There, we noted that USA Power's causation argument hinged on its claim that "Ms. Williams *was the only lawyer* who could

---

[213] This discussion shows one way in which a malpractice claim based on negligence may differ from a malpractice claim based on the breach of a fiduciary duty. In a traditional malpractice suit, the client is directly and negatively impacted by the attorney's actions. In certain types of fiduciary duty cases, like the one before us today, the client may not be able to show that the attorney's actions directly compromised its position. Instead, the client can show that the breaching attorney's conduct gave another party a comparative advantage over the client, leaving the client in a worse position overall. For example, in this case, nothing Ms. Williams did negatively impacted USA Power's ability to submit the best proposal in response to the RFP that it could. USA Power has instead argued that Ms. Williams negatively impacted USA Power's bid *as compared to* PacifiCorp's proposal. In other words, USA Power is arguing that Ms. Williams improved PacifiCorp's proposal by locating the necessary water rights and, as a result, USA Power's bid was disadvantaged when it came time to select a bid.

[214] *Aller v. Law Office of Carole C. Schriefer, PC*, 140 P.3d 23, 26 (Colo. Ct. App. 2005). In *Aller*, a client "disclosed personal and confidential information to attorney when attorney represented her in a matter involving the termination of a business." *Id.* at 25. After that matter ended, "attorney represented plaintiff's business associate, [Ms.] Gale, in a lawsuit brought by [Ms.] Gale against the plaintiff." *Id.* The client filed a malpractice suit against the attorney for breach of the attorney's fiduciary duties. *Id.* The court affirmed the trial court's grant of summary judgment for lack of evidence of causation based on the trial court's conclusion that had the attorney not been involved in the case between Ms. Gale and the client, "some other, conflict free lawyer would have represented Ms. Gale against [plaintiff] and taken the same actions as counsel." *Id.* at 26 (alteration in original).

have successfully secured the necessary water rights," a claim that PacifiCorp had countered by arguing that "any other water attorney in Utah could have duplicated her services."[215] We concluded that there was a factual dispute concerning this issue.[216] Thus, far from rejecting this causation standard, we recognized that USA Power had the burden of showing that "Ms. Williams was the only lawyer" who could have done the work. Indeed, despite its contentions otherwise, USA Power acknowledges this requirement in its briefing by arguing that Ms. "Williams was uniquely situated[] and indispensable" to PacifiCorp. If Ms. Williams was truly uniquely situated, then her work could not have been duplicated by another attorney of reasonable skill and diligence within the RFP time constraints.

¶ 118 Because USA Power's central theory of causation is that Ms. Williams caused USA Power to lose the RFP, which caused USA Power to lose the $21 million it would have earned from building and operating a power plant in Mona, USA Power must show not only that Ms. Williams disadvantaged it in the bidding process, but also that it would have benefitted in the specific way it claimed. To do this, USA Power was required to provide evidence that, had Ms. Williams declined to assist PacifiCorp, PacifiCorp would either have not hired another attorney or that a reasonably skilled and diligent attorney would not have been able to duplicate Ms. Williams's work in locating water, PacifiCorp's proposal would have accordingly failed for a lack of water rights, and USA Power would have won the RFP, negotiated a profitable power purchase agreement with PacifiCorp, and then built and operated the power plant for twenty years.[217] We turn now to the evidence USA Power presented in support of this chain of causation.

---

[215] *USA Power I*, 2010 UT 31, ¶ 69, 235 P.3d 749 (emphasis added).

[216] *Id.* ¶ 70.

[217] Ms. Williams has also argued that USA Power failed to present expert testimony as to whether another attorney could have duplicated Ms. Williams's efforts. Although we agree that expert testimony is generally required to establish complex questions of causation, we note that USA Power has presented some expert testimony as to its theory of causation, as Ms. Williams acknowledged in her motion for a new trial. And because we conclude that this testimony is insufficient to support a verdict

(Continued)

*B. There Is No Competent Evidence from Which a Reasonable Jury Could Infer that Absent Ms. Williams's Conduct, USA Power Would Have Benefitted by Winning the RFP*

¶ 119 USA Power's main argument on appeal is that the trial court erred in granting Ms. Williams's motion for JNOV for lack of evidence of causation as it related to the failed RFP bid. We review the court's grant of JNOV for correctness, mindful that a JNOV can be granted "only if there is no 'basis in the evidence, including reasonable inferences which could be drawn therefrom, to support the jury's determination.'"[218] And when the question is one of causation, we take the question from the jury only if "the facts are so clear that reasonable persons could not disagree about the underlying facts or about the application of a legal standard to the facts" or if "the proximate cause of an injury is left to speculation."[219]

¶ 120 As it pertains to the lost RFP bid, USA Power's causation theory was as follows:

- "Only one power plant could be built in Mona; if PacifiCorp awarded itself the RFP, was granted the CC&N, and constructed [Currant Creek], the [Spring Canyon Project] would be rendered worthless."

- PacifiCorp could not win the RFP without a firm water supply.

- PacifiCorp only had a limited time in which to acquire these rights.

- "Obtaining water in Mona was very difficult and required a long lead time."

- Ms. Williams was able to obtain water rights for PacifiCorp in substantially less time than it took her to obtain water rights for USA Power because of her prior work for USA Power. That shortened time frame was necessary for PacifiCorp to win the RFP.

---

against Ms. Williams, we see no need to inquire further into what additional expert testimony may have been necessary.

[218] *ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 2013 UT 24, ¶ 18, 309 P.3d 201 (citation omitted).

[219] *Harline*, 912 P.2d at 439.

- Ms. "Williams was instrumental in the engineer approving PacifiCorp's [change of use] application and rejecting Mona residents' objections."

- "USA Power's Bid #135 came in second behind [PacifiCorp's bid]. Accordingly, if PacifiCorp would not have awarded itself the RFP, USA Power would have won, entered into a PPA with PacifiCorp, and been operating Spring Canyon today."

¶ 121 After hearing USA Power's evidence on this chain of causation, the trial court granted JNOV after drawing two conclusions from the evidence presented: first, the trial court found that "[t]he undisputed expert testimony at trial demonstrated that [Ms.] Williams'[s] efforts . . . were competent, but not materially different than could be achieved by any number of water lawyers in Utah." And second, the court found that because "the undisputed evidence was that when PacifiCorp entered into the RFP process, it had not firmly secured water rights[,] . . . the jury could not reasonably infer that [Ms.] Williams'[s] efforts in obtaining water were the linchpin that allowed [PacifiCorp's proposal] to be selected."

¶ 122 After reviewing the evidence supporting USA Power's theory of causation, we agree with the trial court as to both of these conclusions. As we discuss below, USA Power has not shown that absent Ms. Williams's conduct, another attorney of reasonable skill and diligence could not have performed the same work for PacifiCorp. Further, even if we were to conclude that Ms. Williams's efforts were unique, the record shows that the acquisition of water rights was not critical to the RFP process. Accordingly, there is no evidence that, even without any water rights, PacifiCorp would have selected USA Power's bid over its own.

1. USA Power has not provided competent evidence that Ms. Williams was uniquely qualified and able to secure water for PacifiCorp

¶ 123 The first problem with USA Power's causation theory is that there is no credible evidence that Ms. Williams's "conduct did not cause [USA Power] any pecuniary loss or damage [USA Power] would not have also suffered had another attorney represented [PacifiCorp]."[220] Because the undisputed evidence was that

---

[220] *Aller*, 140 P.3d at 26.

PacifiCorp would have hired a different lawyer in the absence of Ms. Williams, we must determine whether USA Power presented evidence that its bid would have succeeded regardless of this hypothetical attorney looking for water for PacifiCorp's proposal. And if a different attorney of reasonable skill and diligence could have found water for PacifiCorp within the RFP time constraints, then PacifiCorp would still have not selected USA Power's proposal, USA Power would not have benefitted absent Ms. Williams's conduct, and she could not be the cause of USA Power's damages.

¶ 124 The evidence that USA Power relies upon to argue that Ms. Williams was "uniquely positioned" to find water for PacifiCorp centers on its claim that obtaining water in Mona was difficult and required a long lead time. USA Power claims that because it took Ms. Williams five months to find water for PacifiCorp, whereas it took her fifteen months to do the same for USA Power, the jury could draw the reasonable inference that the difference in timing was due to the legal work performed and confidential information she obtained as USA Power's lawyer. Accordingly, another attorney could not have performed the same work within the same critical timeframe. As the trial court found, however, this comparison is inapt as "[t]he undisputed expert testimony at trial demonstrated that [Ms.] Williams'[s] efforts . . . . were competent, but not materially different than could be achieved by any number of water lawyers in Utah."

¶ 125 First, Ms. Williams was hired by USA Power to find options for water rights, but the undisputed evidence showed that "[n]one of the potential water sellers [was] interested in an option." Further, the evidence showed that USA Power did not actually spend fifteen months looking for water, as USA Power hired Ms. Williams in April 2001 but did not "release" her to look for water options until September 2001. And the evidence tending to show that obtaining water rights in Mona was difficult relied on evidence showing the difficulty of obtaining rights to 10,000 acre-feet—the amount necessary for a wet-cooled plant. Although USA Power has clearly demonstrated that obtaining such a large amount of water in Mona is a difficult task, this evidence could not inform a jury about the difficulty of obtaining 400 acre-feet of water—the amount necessary for a dry-cooled plant such as the one that was actually built. Evidence showing the difficulty of obtaining twenty-five times the amount of water that was ultimately necessary is insufficient as a matter of law.

¶ 126 Ultimately, USA Power presented no competent evidence on the time it would have taken an attorney of reasonable skill and

diligence to locate potential sellers of water in the amount that was needed. Further, USA Power did not contradict the evidence that showed that other attorneys were able to locate potential sellers of water in the Mona area within a short period of time. Because USA Power has not shown that Ms. Williams was uniquely positioned and that another attorney could not have performed the same work for PacifiCorp within the same relevant timeframe, the trial court was correct in granting JNOV.

2. USA Power has not provided competent evidence that PacifiCorp could not have won the RFP without a firm water supply

¶ 127 Even if we were to disregard USA Power's failure to present evidence related to whether another attorney could have performed the same work that Ms. Williams did, there remains a far more fundamental problem with USA Power's theory of causation. The most important link in USA Power's chain of causation is its assertion that "PacifiCorp could not win the RFP . . . without a firm water supply." But the evidence, as adduced at trial, simply does not support USA Power's argument that water rights—and Ms. Williams's securing of the same—was critical to PacifiCorp's bid. For the reasons discussed below, we agree with the trial court that "the jury could not reasonably infer that [Ms.] Williams'[s] efforts in obtaining water were the linchpin that allowed [PacifiCorp's proposal] to be selected."

¶ 128 The only evidence that a firm water supply was essential to PacifiCorp's decision was a statement by Ms. Williams in a memorandum stating, "It is unlikely that PacifiCorp's proposal will succeed in the RFP process without a firm water supply." But this assertion is belied by the undisputed evidence that PacifiCorp's proposal did in fact succeed in the RFP process without a firm water supply in place. It is undisputed that PacifiCorp had no water rights when it submitted its bid on July 17, 2003. Indeed, PacifiCorp's proposal stated only that water "would be supplied by local wells and pumped to the Plant." It is also undisputed that PacifiCorp did not enter into an agreement to obtain water rights until September 3, 2003, well after the RFP deadline of July 22. USA Power asks us to infer that because PacifiCorp's board knew water was essential to operating a power plant, and was likely aware of the water rights contract entered into on September 3, that it relied on the presence of the contract in awarding the bid to itself on September 22. This inference, for the reasons discussed below, is unreasonable.

¶ 129 First, all evidence of the RFP process suggests that water was not a significant consideration in the bid process. Water is, of course, absolutely essential to the operation of a power plant. But

this fact alone is not enough to reach the inference that a firm water supply was essential to this specific bid process. As both parties' counsel agreed at oral argument, it would be an unreasonable inference to assume that every one of the dozens of bids proposing the construction of a new power plant submitted in response to PacifiCorp's RFP had contracts for water already established. Indeed, the RFP did not require a bidder to identify whether it had any such contracts in place, and PacifiCorp did not actually identify its source of water in its bid.[221] It is accordingly unreasonable to infer that having a water contract in place was an essential element of any bid, including PacifiCorp's. Further the evidence is clear that the water rights that PacifiCorp did obtain were conditioned on approval from the State Engineer, which was not obtained until February 3, 2004—after construction had already begun on the project.[222] Accordingly, PacifiCorp was not required to have a firm water supply in place in order to award itself the bid, because its water supply was not "firm" during the relevant timeframe.

¶ 130 A second problem with USA Power's inference is that the purpose of the RFP, as described by USA Power's counsel, was to help PacifiCorp convince the Public Service Commission that whatever proposal it accepted was the most feasible. In order to accomplish this goal, PacifiCorp had the bids vetted by a neutral third party before making its decision. This third party ranked PacifiCorp's proposal above all others. Although PacifiCorp selected its own proposal on September 22, 2003—after PacifiCorp had secured a contingent water rights contract—USA Power has not provided any evidence that PacifiCorp amended its bid to ensure that the neutral third-party reviewer could use the updated information in its evaluation of PacifiCorp's proposal.[223] As the

---

[221] The RFP only requested that a bidder "include a description of . . . [the] [s]ource of process and/or cooling water." PacifiCorp's proposal satisfied this requirement by simply stating that water "would be supplied by local wells."

[222] The water purchase contract was subject to approval of the State Engineer and the Goshen Irrigation Board—which was not obtained until February 3, 2004.

[223] The RFP states that PacifiCorp would retain a neutral consultant "to serve as a clearing house for the receipt of 'pre-blinded' responses, bidder financial information and to oversee and validate the consistent application of evaluation techniques."

(Continued)

purpose of the RFP was to confirm that PacifiCorp's bid was the best option, and this confirmation came regardless of the PacifiCorp board's knowledge of the contingent water contract, it is unreasonable to infer that the water contract was outcome determinative of either the neutral review or the bid process as a whole.

¶ 131  This is a case where "the facts are so clear that reasonable persons could not disagree about the underlying facts or about the application of a legal standard to the facts."[224] The evidence unmistakably demonstrates that, while PacifiCorp could not build and operate a power plant without water, it could and did select a bid without a firm water supply. Thus, USA Power has not shown that even absent Ms. Williams's work for PacifiCorp, PacifiCorp's bid would have failed and it would have selected USA Power's bid instead.

¶ 132 Each of the issues related to USA Power's theory of causation that we discussed above is fatal to its claim against Ms. Williams. In asserting its specific theory of causation, USA Power necessarily took on the burden of proving each link in the chain of causation linking Ms. Williams to USA Power's failed bid. Although the standard of review we employ when reviewing a grant of JNOV is highly deferential to the jury's verdict, we hold that USA Power failed to demonstrate that there is any competent evidence that absent Ms. Williams's conduct, it would have benefitted by having PacifiCorp's bid fail and its own bid succeed. Accordingly, we affirm the trial court's grant of JNOV as to this issue.

II. There Is No Competent Evidence from Which A Reasonable Jury Could Infer Ms. Williams Caused USA Power to Lose the Contract.

¶ 133  As an alternative to the lost RFP damages discussed above, USA Power also argues that "absent [Ms. Williams's] fiduciary duty breaches, USA Power would have benefitted by selling the project to PacifiCorp." This refers to the earlier agreement, entered into March 14 and terminated on March 17, 2003, wherein PacifiCorp agreed to purchase the Spring Canyon project developed by USA Power and employ USA Power's principals to assist with other power

---

Consideration of information outside of a bid in order to rank options, something USA Power has not argued occurred, would seem to invalidate this purpose and would cast the entire bid process into suspicion.

[224] *Harline*, 912 P.2d at 439.

generation projects. Ms. Williams argues that USA Power failed to provide sufficient evidence to prove that she caused the loss of the agreement. For the reasons discussed below, we agree.

¶ 134 USA Power has provided no evidence from which a reasonable jury could infer that Ms. Williams caused the loss of the contract. As stated above, the relevant standard is whether there is any competent evidence that leads to reasonable inferences that "absent the conduct complained of . . . the client would have benefitted."[225] Here, this means that USA Power must present some competent, non-speculative evidence that absent Ms. Williams's work for PacifiCorp, PacifiCorp would have honored and not terminated the agreement entered into on March 14, 2003.

¶ 135 The only evidence USA Power provided to support its alternative theory of causation is a timeline: PacifiCorp decided to withdraw its offer to purchase the USA Power project about two weeks after PacifiCorp hired Ms. Williams. Specifically, USA Power provided evidence of both the project's viability and of PacifiCorp's recognition of the project's viability, details of some of the various offers and counteroffers that the parties exchanged between February and March of 2003, and that "on March 14, 2003, PacifiCorp agreed to purchase [the Spring Canyon project] for $3 million and a five-year [joint development agreement]." Three days later, March 17, 2003, PacifiCorp "reneged on the deal." The only evidence of Ms. Williams's involvement in all of this, however, is that Ms. Williams "commenced representation and working for PacifiCorp on March 3, 2013."[226] And after being retained by PacifiCorp, the only evidence provided about Ms. Williams's work during that time was that she researched the possibility of securing water rights from Geneva Steel. Based on these facts, USA Power suggests that the jury "could infer that, without [HRO and Ms. Williams] commencing their conflicting representation of PacifiCorp, USA Power would have benefitted in the amount of $5.29 million." This is insufficient evidence of causation.

---

[225] *Christensen & Jensen, P.C. v. Barrett & Daines,* 2008 UT 64, ¶ 26, 194 P.3d 931.

[226] Although USA Power points out that this representation occurred "while [Ms. Williams was] still counsel to [USA Power] on [Spring Canyon]," this is evidence only of breach of [Ms.] Williams's fiduciary duties, not of causation.

¶ 136 Evidence that relies exclusively on the *post hoc ergo propter hoc* fallacy—"after this and therefore because of this"—is not competent.[227] In *Breton v. Clyde Snow & Sessions*, the court of appeals rejected an argument that an attorney caused a client's damages when the only evidence was that "after [the attorney] was negligent, the Slater Brothers sued [the client]; therefore, the Slater Brothers sued [the client] because [the attorney] was negligent."[228] The court stated that this type of "circular reasoning"[229] was insufficient because courts do not "assum[e] a causal connection between two events merely because one follows the other."[230] We agree with this analysis.

¶ 137 The argument here is similar to that rejected in *Breton*: after Ms. Williams started working for PacifiCorp, PacifiCorp reneged on the deal; therefore, PacifiCorp reneged on the deal because Ms. Williams started working for PacifiCorp.[231] The only evidence that sheds any light on what Ms. Williams actually did between March 3 and March 17 shows that she worked to acquire water rights from Geneva, an entity with no connection to either USA Power or the agreement. There is no evidentiary support for the inference that she advised anyone at PacifiCorp on any aspect of the contract for the sale of the Spring Canyon project. Further, there is

---

[227] *See Breton v. Clyde Snow & Sessions*, 2013 UT App 65, ¶ 12, 299 P.3d 13.

[228] *Id.*

[229] *Id.*

[230] *Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 521–122 (10th Cir. 1987). The court of appeals in *Breton* cited and quoted this case as support for rejecting the client's arguments. In the federal case, dealing with defamation, "[t]he only evidence offered was a chronological rendition of events" which placed the alleged defamatory statement prior to a company's financial downturn. *Sunward Corp.*, 811 F.2d at 521. The Tenth Circuit rejected the company's argument, as it consisted solely of "reasoning from sequence to consequence, that is, assuming a causal connection between two events merely because one follows the other." *Id.* (citation omitted).

[231] *Breton*, 2013 UT App 65, ¶ 12 ("In other words, after Clyde Snow was negligent, the Slater Brothers sued Breton; therefore, the Slater Brothers sued Breton because Clyde Snow was negligent. We decline to adopt this circular reasoning.").

evidence that PacifiCorp was considering an RFP instead of an outright purchase of Spring Canyon in February 2003—before PacifiCorp entered into the deal. With no competent evidence tying Ms. Williams to the termination of the contract, the inference that USA Power wishes us to draw is "wholly speculative,"[232] and cannot support a verdict, even under the generous JNOV standard.[233]

¶ 138 Having determined that the trial court was correct in granting JNOV against USA Power on each of its claims against Ms. Williams, we must also affirm the court's denial of punitive damages as USA Power has no other claims against her.[234] Accordingly, we affirm the trial court's decision as to each issue addressed by USA Power in its direct appeal. USA Power failed to provide sufficient evidence that Ms. Williams was the cause of its losses, even under the generous JNOV standard.

## Conclusion

¶ 139 For the reasons discussed above, we affirm the trial court's rulings on all issues. Regarding PacifiCorp's appeal, the trial court correctly concluded that there was sufficient evidence to support the jury's verdict that a trade secret existed. As to USA Power's cross-appeal, where the decisions of the trial court were to be made in the exercise of the trial court's discretion, USA Power has not demonstrated that the trial court abused that discretion either by applying an incorrect legal standard or by improperly reviewing the evidence. As to the other issues raised in the cross-appeal, USA Power has not shown that the trial court erred. Finally, as to USA Power's direct appeal of the trial court's grant of JNOV in favor of Ms. Williams, we hold that there was no competent evidence that absent Ms. Williams's actions, USA Power would have benefitted by having PacifiCorp's proposal fail and its own bid succeed. We

---

[232] *Id.* ¶ 14.

[233] Although "presentation of circumstantial evidence may create a genuine issue of material fact," the inferences to be drawn from such evidence must be more than pure speculation. *USA Power I*, 2010 UT 31, ¶ 65, 235 P.3d 749.

[234] *See Kilpatrick v. Wiley, Rein & Fielding*, 2001 UT 107, ¶ 84, 37 P.3d 1130 ("Under Utah law, if there are no actual damages, an award of punitive damages is improper."); UTAH CODE § 78B-8-201(1)(a) ("[P]unitive damages may be awarded only if compensatory or general damages are awarded . . . .").

accordingly affirm the trial court as to each issue raised in the various appeals.

_____